## STATE v. FRANK J. DUNN.[1]

### June 7, 1918.

### No. 20,857.

**Homicide — testimony of accomplices — conspiracy — circumstantial evidence admissible.**

Appellant's wife, who had been granted a decree of separation from him, was murdered, and he with four other persons were jointly indicted for the crime. Appellant had a separate trial, at which the one who actually committed the deed and another accomplice then present testified for the state. Neither had had any direct communication with appellant. The theory of the state was that the alleged

[1]Reported in 168 N. W. 2.

accomplice who procured these two witnesses to do the killing acted for appellant. It is *held*:

(1) The evidence, aside from that given by the accomplices, is strong and persuasive that appellant not only had a motive, but had formed a fixed purpose to procure some one to kill his wife, and that the actual murderer was procured by appellant's agent to carry out that purpose.

(2) The testimony of the accomplices of the circumstances attending the murder, and tending to connect appellant with a conspiracy to commit the same, finds adequate corroboration in the record.

(3) The evidence showing appellant to be the arch conspirator, though circumstantial, is amply sufficient to sustain the verdict.

(4) The effect of the testimony as to previous good character was for the jury; it cannot be said, as a matter of law, that it is sufficient, when considered with all the evidence in the case, to raise a reasonable doubt of guilt.

(5) A prima facie case of conspiracy by appellant and others to murder his wife, made evidence admissible of the acts and statements thereafter made by any one of the conspirators in furtherance of the common purpose.

(6) Oral testimony of the contents of a letter written to appellant was properly received; and it was not error to exclude self-serving statements of appellant as to his intentions or treatment of his wife.

(7) The instruction given in respect to the corroboration of accomplices was correct and applicable to the facts developed in this case.

(8) The slight inaccuracy in the use of words in a cautionary remark to the jury was not called to the attention of the court before the jury retired, and should not work a new trial.

(9) Appellant was charged with murder and not conspiracy, and was not entitled to an instruction that conspiracy must be proven beyond a reasonable doubt before the act or declaration of a coconspirator, received in evidence, could be considered.

(10) No error was made in refusing a request which singled out only two of the many witnesses whose testimony should be considered under the caution, of doubtful value, of falsus in uno, falsus in omnibus.

(11) The refusal to give other requests was not error, for, insofar as not covered by the charge, they were either incorrect or inapplicable.

(12) The record furnishes no fair basis for charging the prosecuting attorney with misconduct.

Mike Moore, Frank J. Dunn, Joseph P. Redenbaugh, Frank McCool and John Doyle were indicted by the grand jury charged with the crime of murder in the first degree. Frank J. Dunn demanded a separate trial which was had in the district court for Ramsey county before Hanft, J., and a jury which found him guilty of the crime as charged in the indictment. The court sentenced him to hard labor for life in the state prison. From an order denying his motion for a new trial, defendant appealed. Affirmed.

*Douglas, Kennedy & Kennedy and Percy D. Godfrey,* for appellant.

*C. L. Hilton,* Attorney General, *Richard D. O'Brien,* County Attorney, *Harry H. Peterson,* Assistant County Attorney, for respondent.

HOLT, J.

The defendant, Frank J. Dunn, was convicted of the crime of murder in the first degree and sentenced to the penitentiary for life. The victim was his wife, Alice M. Dunn. He appeals from the order denying a new trial.

Four propositions are advanced as grounds for a new trial, viz.: The evidence does not support a conviction; the court erred in rulings upon the admission and exclusion of testimony; there were errors and defects in the charge; and misconduct of counsel.

The main facts and circumstances leading up to and surrounding the crime, as revealed at the trial, which the state contends unerringly point to and prove defendant's guilt, will briefly be stated. At about 1:30 a. m. of April 26, 1917, three men known as Joseph P. Redenbaugh, Frank McCool and John Doyle broke into the dwelling 793 Selby avenue, St. Paul, where resided James F. McQuillan and his family. The members of the family were Mr. McQuillan and his wife, two sons and two daughters. The older of these daughters was Alice M. Dunn, a young woman about 27 years old. The house faced south on Selby avenue. The two daughters slept in the same bed in the southeast corner room on the second floor. Their parents occupied the northeast corner room on the same floor; one of the sons was in the room between the two mentioned; and the other son, a young lad, slept in the northwest corner room. Redenbaugh and McCool testified to the breaking in, and to the fact that the former alone went into the northeast bedroom, flashed a search light into

the faces of the two young women, and fired a 44-40 caliber Colt revolver three times into the head and body of Alice, while in the embrace of the sister, who was fully awake and frantically screaming. No effort was made to take the valuable diamond rings worn by Alice, nor her watch, nor any other valuables in that room. Before the shooting, Mr. Mc-Quillan's bedroom was entered and a pocket book and a check book taken from the trousers. The money thus obtained was insignificant. The shooting and the screaming of the younger daughter aroused the other sleepers and the murderers made a hasty retreat. On their way down town the pocket book and check book were thrown away, only the cash being retained. Redenbaugh and McCool testified that the murder was committed under an arrangement made with one Mike Moore, ostensibly the agent of defendant, and for which defendant was to pay the one who performed the deed $3,000 and Moore $1,000; that immediately after the murder the three actual participants returned to the two rooms, previously rented, at 301 Third street west; that in the morning Moore was called over the telephone and requested to come over with the money as soon as he got off duty; that he came about noon and stated that Dunn was dissatisfied, because in the execution of the crime there was a failure to give the appearance that it was committed as an incident to robbery, as had been directed; he had only $65 with him, saying that he would get the balance before two o'clock from Dunn; that he was told to produce the balance at once or defendant would be dealt with as was his wife; that at about 2 p. m. he returned with $2,900 in currency, which was received and divided by Redenbaugh, McCool and Doyle, the $100 being held out because of the $65 paid in the forenoon, and some $50 advanced before the murder. That evening Redenbaugh and McCool fled in a taxicab, they having directed their wives, who occupied the rooms with them, at 301 Third street west, the previous night, to buy transportation to Salt Lake, Utah. The driver of the taxicab was to take Redenbaugh and his companion to Shakopee, but high water diverted the party to Chaska. The next morning Redenbaugh and McCool bought tickets to Shakopee, and from there took the train to Omaha and the west coast, where later they were apprehended. Doyle has not been found.

Some events prior to the murder should be stated. On August 4, 1914,

appellant, a widower 40 years old, married Alice M. McQuillan.    They lived together for 70 days, then separated.    The evidence, adduced by the state, tends to show that both the wife and her father made repeated attempts at reconciliation, but were met by surly rebuffs each time until some two weeks or so prior to the murder, when Dunn seems to have led his wife to believe that he was ready to again live with her at some place other than in St. Paul.    The state contends that his apparent change of heart was but a ruse to encompass her death and forestall suspicion in his direction.    For a time after the separation Alice lived in the house where they had started housekeeping, he residing or boarding in an adjoining house also owned by him.    During all this time appellant was in business, and had acquired considerable property, apparently.    He had dealt in horses and stock and for years had government contracts, carrying mail from the trains to the post office.    Early in 1915, Mrs. Dunn began an action for separation.    It was tried the latter part of June and soon thereafter a decree in her favor was entered, allowing her $70 a month for support, securing the payment thereof by affixing liens on his property.    The publicity of the trial and the encumbering of his property appear to have galled appellant exceedingly, for the state produced evidence that about this time he began to lay plans for his wife's destruction.    He made inquiries for the address of one Al. F. Brown, with whom he had worked and who was known to have been suspected of crime.    He obtained the address, and visited Brown in Montana July 3, 1915, related to him the troubles with Mrs. Dunn, and asked him whether he knew any one that for $10,000 would rid him of her.    Upon a telegram from Brown, Dunn, 10 days or two weeks later, made another trip to Montana, met Brown, who introduced S. C. Ferdig as a person capable of doing what Dunn desired.    Dunn registered at the hotel under the name of Murphy.    Both Brown and Ferdig testified that on this trip Dunn offered to pay a large sum if his wife could be put away.    Some negotiations were had in respect to advance payments and terms, and Dunn returned to St. Paul.    On July 22 or 23 Ferdig came to St. Paul.    He received $1,000 from Dunn.    He testified that Dunn took him to his house; procured him to take his meals there so that he could have the opportunity to become acquainted with the looks of his intended victim, who still resided in the adjoining house; that he pointed her out to him as she

was sitting in a hammock; showed him a place nearby, at the steps by the Selby tunnel, where Mrs. Dunn might be despatched; and took him in an automobile to the railroad yards where a getaway could be made after the crime had been carried out. After receiving the $1,000 Ferdig, instead of carrying out the directions of Dunn, telegraphed for Brown. The pair met this defendant by appointment, and, by means of a threat to have him prosecuted for plotting the death of his wife, obtained $4,000 from him. This money he had in a box in a bank vault. Later in the fall both returned for more blackmail, and appellant again responded, letting Ferdig have $550 and Brown $50; but this time he procured his lawyer to draw receipts stating that the $50 was in full for services in land transactions. The lawyer handed the $50 to each of the parties. No receipt was asked or given for the $500. Dunn testified that his trips to Montana were only for the purpose of purchasing land. Witnesses for the state contradict him, stating that when he inquired for Brown's address he stated that he wanted to ascertain from him whether it would not be profitable to ship horses to that state.

One Hickey, for the state, testified that in the fall of 1916, when confined in the St. Paul workhouse, Moore came to him and said that if he desired to make some money to come, as soon as let out, to Chickett's saloon, where Moore was bartender. Hickey came and was told by Moore that "there was a party in town that a woman was bleeding, and that this party wanted her bumped off," and if Hickey would take hold of it there was $3,000 in it for him. Later Hickey needed money and applied to Moore. Moore used the telephone, and in a few minutes Dunn came and talked with Moore. The latter offered to introduce Dunn to Hickey, but Hickey testified to hearing Dunn say it were better for him not to know Hickey. Hickey also testified that Dunn handed money to Moore, and as soon as Dunn left Hickey received $50 from Moore. Moore worked for a small salary, paid weekly. About this time Hickey met Redenbaugh, a hardened criminal 20 years old, at Chickett's. Both men occupied a room over the saloon for a short time, and left the city together. Redenbaugh went to Kansas City, married and lived there some months. While there he received letters from Moore inquiring whether he was to carry out the deal Hickey had undertaken, as the latter had apparently an attack of cold feet. Towards the middle of

April, 1917, Redenbaugh came to St. Paul with McCool and Doyle. Through arrangement with Moore, Redenbaugh was to go with him to a certain drug store, where he claimed Mr. and Mrs. Dunn were to come, so that Redenbaugh would have the opportunity to make sure of the intended victim. The first date was set for the evening of April 15, but Redenbaugh was unable to keep the appointment because the train upon which his wife was to arrive was late and he felt he must meet her at the depot. The nineteenth was thereupon selected, and Redenbaugh testified he then went with Moore to this drug store; that defendant and his wife came in and had some refreshment, and Moore pointed them out. Dunn admits he was at this drug store at both times with his wife. Between 1 and 2 o'clock p. m. of the twenty-sixth Dunn and his brother visited a safety deposit vault where they had a box. The claim of the state is that the $2,900 paid the murderers was then obtained. It is not possible within the limits of an opinion to point out in detail all the circumstances tending to prove that, from the time the separation suit came to trial, the defendant conceived a fixed purpose to do away with his wife, and that he pursued that purpose relentlessly to the end.

The defense contends that discrepancies are found in the testimony of the state's witnesses; that neither Redenbaugh nor McCool claim to have had any communication with Dunn or to have seen him speak to Moore; that Dunn's visit to the safety deposit vault shortly after noon on April 26 was to get a note which one Gleason desired to pay; that the state has failed to show that Redenbaugh and McCool had any money worth mentioning after the murder; and that Dunn's previous unblemished character, as testified to by numerous persons from all walks of life, is such that the jury were not justified in finding him guilty. It should be mentioned here that defendant admits that he paid Ferdig the $1,000 in July, 1915, and Brown and Ferdig $4,000 more, a few days later, and also $550 or $600 additional in the fall of the same year, but says fear caused him to submit to this blackmail—realizing that on his visits to Montana he had incautiously related his domestic troubles to these men, and thus enabled them to concoct the story that he plotted his wife's murder, for, being two against one, they stood a good chance of successfully carrying out the threat of criminal prosecution. Of course, Dunn denied any connection with Moore and sought to show that he felt

kindly towards his wife, treated her accordingly, and never indicated by word or deed an intention to cause her harm.

Moore, Redenbaugh, McCool and Doyle were indicted jointly with defendant. Moore had been tried separately. Neither side procured his testimony in this case. Doyle has not been caught. Redenbaugh and McCool are now in the penitentiary, both being sentenced for the brutal killing of policeman Connery of Minneapolis, two days prior to the murder of Alice M. Dunn—Redenbaugh for life and McCool for 30 years. Neither has as yet been tried under the indictment here involved.

The above recital must suffice as a basis for disposing of the contentions made for a new trial. In claiming that the verdict is not justified and that appellant was entitled to an instructed verdict in his favor, four propositions are advanced. It is said:

(a) The evidence having probative force does not connect Dunn with the murder; and that which pretends to connect him is from discreditable sources and full of contradictions. The record has been examined with much care. Some minor discrepancies appear in the testimony of witnesses for the state, but the same may be said as to that of appellant. However, on the whole, it can truthfully be said that this record contains less of unexplainable contradictions than is usually found in important criminal prosecutions, and the evidence pointing to guilt is of such cogency that it is not perceived how an impartial mind, considering the same in all its bearings, can escape the conviction that appellant is guilty beyond a reasonable doubt. The confessed actual murderer could have had no purpose in making so certain the death of the one sister and taking pains to inflict no harm on the other, clinging to her, unless this was done pursuant to the direction of Dunn, as Redenbaugh testified to having been instructed by Moore. Neither could his companions McCool and Doyle have had. They must have been directed, as they said, not only to the house, but to the one victim in that house. Nor could Moore have had any motive for desiring the death of this young woman, except for the price that was to be obtained from some one who had. Appellant alone seems to have had a sufficient motive to pay the price. He would not live with his wife. Her religion and, perhaps, her love forbade her from setting him free. He was compelled to pay her a substantial monthly allowance. The decree, under

which this was assured to her, interfered with his property. These matters seemed to have galled him. There is evidence outside of that of accomplices that an adequate motive appeared to Dunn for paying a goodly sum to have Mrs. Dunn killed. It is unthinkable that a business man of the age, experience and standing of Dunn, were he innocent of the plotting testified to by Brown and Ferdig, would have tamely submitted to be blackmailed in his home city by outsiders in the large amount he admits. His own admissions corroborate the state's theory of crime.

(b)  It is said the evidence of Redenbaugh and McCool is uncorroborated, impeached and discredited. The testimony of Hickey, Brown and Ferdig, as well as appellant's admitted dealings with the two last named, corroborate the story of Redenbaugh and McCool insofar as relates to Dunn's planning to have the life of his wife taken. The jury could also find corroboration in the planned meetings with Mrs. Dunn in the drug store on the fifteenth and nineteenth of April, in the visit to the safety deposit vault after the murder on the twenty-sixth, and in other circumstances that dovetail in with the testimony of Redenbaugh and McCool as to when the former saw Mr. and Mrs. Dunn in the drug store and as to when the $2,900 were paid, to say nothing of the circumstances attending the actual killing. The rule as to the extent of corroboration of the testimony of accomplices has been so often and so clearly stated that no restatement is needed here. We merely refer to a few authorities: 1 Dunnell, Minn. Dig. § 2457; State v. Lawlor, 28 Minn. 216, 9 N. W. 698; State v. Barrett, 40 Minn. 77, 41 N. W. 463; State v. Whitman, 103 Minn. 92, 114 N. W. 363, 14 Ann. Cas. 309; State v. Briggs, 122 Minn. 493, 142 N. W. 823; State v. Price, 135 Minn. 159, 160 N. W. 677; State v. Becker, 215 N. Y. 126, 109 N. E. 127, Ann. Cas. 1917A, 600; 5 Ruling C. Law 1090, § 40.

(c)  That the evidence involving appellant is circumstantial may be conceded, but it is none the less persuasive. It is true, as the defense states, that the incriminating circumstances come largely from the testimony of confessed blackmailers like Brown and Ferdig, a professional thief like Hickey, and convicted murderers and hardened criminals like Redenbaugh and McCool, and if there be any act or declaration of Moore admissible, as of a coconspirator, he also had served time. The state properly retorts that it has no choice of witnesses; it must make use

of those in whose presence or through whom the accused chose to carry out his purpose, unless by chance some one unknown to him accidentally learned thereof; and that no sane person bent on murder, but unwilling to personally commit the act, would do otherwise than seek his tool from the most hardened criminals. Appellant, as we understand, does not controvert the legal proposition that conviction may be had upon circumstantial evidence alone, but claims that in this case it is not strong enough to connect Dunn with the crime. We think it legally sufficient for the jury to find Dunn not only a participant in, but the real instigator of the crime charged.

(d)  The good character and business standing of appellant are said to balance the scale of justice in his favor. Previous good character no doubt weighs heavily for a defendant in a criminal prosecution. But it is for the jury to determine whether the proof of good reputation, the evidence of character, is such that, in connection with all the other evidence in the case, it suffices to raise a reasonable doubt of guilt. It is not infrequent that persons of previous good character commit crimes most foul. The effect of the evidence of Dunn's good character and disposition was for the jury alone.

In connection with this claim of the insufficiency of the evidence to sustain the verdict, the learned counsel, who now appear for appellant, but who did not participate in the trial, contend that if Dunn is to be held for this murder it must be as a coconspirator with Redenbaugh, and that the only evidence of that is to be found in certain acts and declarations of Moore testified to by Redenbaugh. We think that is not so.

In the first place, a conspiracy being established, the acts and declaration of any one of those in the conspiracy, made thereafter in the furtherance thereof, is proper evidence in the trial of any one of the coconspirators, whether present or absent. State v. Evans, 88 Minn. 262, 92 N. W. 976; State v. Ames, 90 Minn. 183, 96 N. W. 330; State v. Hunter, 131 Minn. 252, 154 N. W. 1083; Kelley v. People, 55 N. Y. 565, 14 Ann. Rep. 342; Spies v. People, 122 Ill. 1, 12 N. E. 865, 17 N. E. 898, 3 Am. St. 320; Collins v. State, 138 Ala. 57, 34 South. 993; Sanderson v. State and Cook v. State, 169 Ind. 301 and 430, 82 N. E. 525, 1047; State v. Crofford, 133 Iowa, 478, 110 N. W. 921; People v. McGarry, 136 Mich. 316, 99 N. W. 147; State v. Prater, 52 W. Va. 132, 43 S. E. 230. The

crime for which appellant was being tried was murder and not conspiracy; but the existence of a conspiracy to murder was an evidentiary fact tending to prove appellant's connection with the crime charged. It was not therefore necessary to prove the conspiracy beyond a reasonable doubt, prima facie proof was all that was required to let in evidence of a coconspirator's acts and declaration, done or made in furtherance of the common purpose, to implicate any other coconspirator. The rule is thus clearly stated in 2 Wharton, Law of Evidence, § 1205: "Whenever a conspiracy is shown (which is usually inductively from circumstances) the declarations of one co-conspirator in furtherance of the common design, as long as the conspiracy continues, are admissible against his associates, though made in the absence of the latter. The least degree of concert or collusion between the parties to an illegal transaction makes the act of one the act of all." The text is sustained in the decisions just above cited.

In the second place, neither Brown, nor Ferdig, nor Hickey went so far with Dunn as to be held accomplices as a matter of law. Their testimony is persuasive that Dunn had not only a motive to cause his wife's death, but that he had a fixed purpose to accomplish the deed as soon as a willing tool could be procured. Circumstantial evidence as well as Hickey's direct testimony connects Dunn with Moore. Therefore acts and statements made by Moore in carrying out the conspiracy were properly received in evidence. Their value as proof of the facts to which they relate depends largely upon the manner in which they fit in and connect with other established facts and circumstances. If the jury concluded a conspiracy existed they must have found that it was formed, as between Dunn and Moore, previous to the writing of the letters by the latter to Redenbaugh at Kansas City; and all the acts and declarations of Moore of which evidence was received occurred thereafter and in carrying out the planned murder and the payment of the price therefor.

The alleged errors in rulings at the trial require no extended discussion. It was not error to receive testimony as to the contents of a letter sent to defendant. State v. Minor, 137 Minn. 254, 163 N. W. 514. Nor do we think there was prejudicial error in permitting Redenbaugh to explain a veiled expression in a letter received by him from

Moore, or to give the contents of lost letters from the same source. Furthermore nothing of importance was added thereby to what appeared from the letters produced, purporting to come from Moore, and showing plainly that none other than one possessing the knowledge Moore did could have written them. It is plain that the rulings were correct excluding self-serving statements of Dunn as to his kind intentions and treatment of his wife.

Exception is taken to the charge wherein the jury were instructed that if the state's claim was found true "that Redenbaugh killed Alice M. Dunn, and that Dunn directly or indirectly induced and procured him to do the killing, then Redenbaugh and McCool were accomplices, and the defendant cannot be convicted on their testimony unless they are corroborated by such other evidence as tends to convict Dunn of the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense and the circumstances thereof. The corroborating evidence must, independently of the testimony of Redenbaugh and other accomplices, tend in some degree to establish the guilt of the defendant Dunn, but it need not be sufficient, standing alone, to justify a conviction." The court also under proper instructions left the jury to decide whether Hickey was an accomplice. It is conceded that the above instructions are the same as were given and approved in State v. Hayward, 62 Minn. 474, 65 N. W. 63; but it is claimed they are inapplicable and misleading here where there is no testimony from Moore, the go-between, and no direct testimony from Redenbaugh that Dunn procured him to commit the crime, whereas in the Haywood case Blixt, the actual slayer, testified that he was hired by Hayward to kill Miss Ging. We think the distinction attempted to be made between the facts of the two cases is not such that it calls for any radical difference in the instructions as to corroboration of accomplices. As already stated insofar as the facts surrounding the killing tended to point to Dunn's connection therewith, the testimony of Redenbaugh was direct. So it was with reference to Moore's part. It is true that the latter's declaration, testified to by Redenbaugh, that he acted for Dunn does not prove the agency; but as already shown it was proper testimony of the coconspirator Moore's participation, and also a proper circumstance to be considered in this case, assuming that

the evidence established a then existing conspiracy of which Dunn was the originator to take the life of Alice M. Dunn.

This caution was given the jury: "It is your duty to examine and consider all the evidence upon the questions at issue with care, to subject it to the scrutiny of your judgment as men of affairs, and to act upon it only insofar as to you it seems reasonable and just." Error is assigned upon the use of the words "reasonable and just." The expression is not to be commended, but, if appellant had apprehension that the jury might be misled into believing that they should not act upon what they found to be true in the evidence unless it were reasonable and just, the attention of the court should have been directed to the matter before the jury retired. State v. Rusk, 123 Minn. 276, 143 N. W. 782. It was a mere verbal inaccuracy which most likely did not prejudice, for the ordinary layman would be apt to say that what is reasonable and just is true.

Error is assigned upon failure to give several requested instructions. The third requested instruction is an abstract proposition of law that was fully covered by the charge, though not in the specific language of the request.

The sixth request to charge was, in substance, that, unless the jury found beyond a reasonable doubt the existence of the conspiracy between the defendant and the other coconspirators, no evidence given with regard to statements or acts of said coconspirators could be considered against this defendant. As above seen, the proposed instruction does not correctly state the law. Again, the circumstances attending the killing, even though coming from Redenbaugh and McCool alone, could certainly be considered by the jury in connection with that of Brown, Ferdig and Hickey, and other witnesses, upon the proposition whether the murder was the result of a conspiracy. If a conspiracy did exist, the evidence unerringly points to Dunn as the prime instigator thereof.

The seventh requested instruction is technically objectionable in that it singles out the witnesses Brown and Ferdig to whose testimony the stereotyped charge, of doubtful merit, falsus in uno, falsus in omnibus is to be applied. Nor do we think the court was required to limit the effect of their testimony to merely showing a guilty intent on Dunn's part. The jury could find that he paid a large sum and stood

ready to pay a still larger sum to encompass the death of his wife; that he had formed a fixed and unalterable purpose to that end.

The tenth request is good law, but inapplicable. The acts and statements admitted in evidence, of defendant's coconspirators and accomplices tending to implicate him were all subsequent to the conspiracy and were in furtherance of the common purpose.

The defendant was entitled to and received a more favorable instruction than the one embodied in the fifteenth request.

The charge of the learned trial court clearly and fairly stated and submitted the issues in the case and gave the applicable legal rules for the jury's guidance in language which fully assured to appellant his legal rights to a fair and impartial trial.

Misconduct of the prosecuting attorney is also claimed. One of the acts of misconduct charged is that there was a wrongful attempt to interrogate appellant's witnesses as to their knowledge of the nature of the charges in the separation suit. The attempt was successful so far only as to permit those character witnesses of defendant who had testified to his reputation for kindness, gentleness and amiability to be asked on cross-examination whether they knew of the charges made against him in the separation suit. He also offered more of the files and records in that case than the court thought proper to receive. It may be that the county attorney desired to acquaint the jury with the ground upon which the deceased based her right to relief, but he did not succeed, and his attempts in that direction are not so clearly wrong or persistent as to require the slightest rebuke. It is said the opening statement, made part of the record, was prejudicial in that the attorney therein announced an intention to prove false or immaterial issues, namely: The grounds upon which separation was decreed; that appellant had placed his property in his brother's name; that he procured the advice of his attorney in the Ferdig blackmail matter; and the conviction of Moore. The testimony pertaining thereto, insofar as received by the court, seems to have made all of these matters except the last, proper for the jury's consideration as circumstances bearing upon the ultimate issue in the case. No objection was raised to the reference to Moore's conviction. Indeed, appellant's counsel on the cross-examination of Redenbaugh brought out the fact that Moore had

been tried. In no aspect can the final argument, also included in the record, be considered improper, unfair or intemperate. True, it is a forceful presentation of deductions to be found in the evidence establishing Dunn's guilt, but the prosecuting attorney is not required to minimize the appearances of culpability or inject doubts of a defendant's guilt. Nor is he forbidden in an argument to state his opinion as to the conclusions or inferences which the human mind may reasonably draw from the evidence.

A perusal of the entire record convinces us that defendant has had a fair trial in which he was ably defended by alert counsel of marked ability and experience in criminal law; that his legal rights were fully protected, and that the verdict is amply sustained by the evidence.

The order must be affirmed.