STATE EX REL. JOSEPH P. REDENBAUGH, ALSO KNOWN AS
E. H. HAMILTON, v. DOUGLAS C. RIGG.

96 N. W. (2d) 555.

May 8, 1959—No. 37,580.

*Miles Lord,* Attorney General, and *Charles E. Houston,* Solicitor General, for appellant.

*Hvass, Weisman, Peterson, King & Schwappach,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Douglas C. Rigg, warden of Minnesota State Prison, hereafter referred to as appellant, appeals from an order of the District Court of Washington County which discharged Joseph P. Redenbaugh, hereafter referred to as respondent, from imprisonment in the Minnesota State Prison.

In his original petition for a writ of habeas corpus, respondent alleged that he was unlawfully held in appellant's custody in that (1) the District Court of Hennepin County, before which he entered his plea of guilty to the charge of *murder in the first degree* on May 25, 1917, and by which he was sentenced to life imprisonment, was divested of jurisdiction at the time because, in contravention of Minn. Const. art. 1, §§ 6 and 7, and U. S. Const. Amend. XIV, he had not been informed by it of his right of counsel; (2) he had not waived his right to counsel; and (3) he had not understood the nature of the indictment against him.

On May 7, 1917, respondent had been indicted by the grand jury of Hennepin County for the murder of George Connery, a Minneapolis policeman. The indictment set forth the crime as follows:

"The said Frank McCool, alias Frank J. Curtis and John Doe [respondent], whose true name is unknown, on the 24th day of April A. D. 1917 at the City of Minneapolis in said Hennepin County, Minnesota, then and there being armed with dangerous and deadly weapons, to-wit: pistols, commonly called revolvers, a more particular description of said weapons being to the Grand Jury unknown, said revolvers being then and there loaded with gunpowder and leaden bullets, and said revolvers being then and there held in the hands of them, the said Frank McCool, alias Frank J. Curtis, and John Doe [respondent], whose true name is to the Grand Jury unknown, did then and there wilfully,

unlawfully, wrongfully, knowingly, feloniously and intentionally, without excuse or justification, without the authority of law, and with a premeditated design to effect the death of a human being, to-wit: one George Connery, kill and murder the said George Connery, by then and there discharging said revolvers at, against, upon and into the body and person of him, the said George Connery, and by then and there therewith and with other deadly and dangerous weapons, a more particular description of which is to the Grand Jury unknown, beating, wounding, bruising and cutting the body and person of him, the said George Connery, thereby and therewith inflicting upon the body and person of him, the said George Connery, mortal wounds, of which said mortal wounds the said George Connery thereafter died in the County of Anoka, State of Minnesota, on the 24th day of April, 1917, * * *.''

At the arraignment respondent then gave his name as E. H. Hamilton. A record of the proceedings there was submitted at the hearing in the present proceedings. It disclosed that:

"* * * Defendant is present in person and County Attorney John M. Rees is also present. After stating that he had no counsel and did not desire any the defendant was duly arraigned and pleaded guilty to the charge."

This was followed by questions of the court answered by respondent relative to his education, age, and background.

On February 3, 1958, a writ of habeas corpus was issued in the present proceedings. On March 10, 1958, a hearing thereon was had in the District Court of Washington County. The trial court made findings and conclusions therein as follows:

"That at the time of his arraignment, * * * petitioner was 19 years of age * * * had a fourth grade education, and was unfamiliar with court procedure. * * * petitioner appeared before the Court without Counsel, and the Court then and there failed and neglected to advise petitioner of his right to be represented by Counsel, and that in the event he was financially unable to provide Counsel, the Court would appoint Counsel to represent him at State expense, if he desired to be so represented.

"That by reason of his youth, lack of experience and knowledge in legal proceedings, lack of education and the complicated nature of the

charge against him, the petitioner did not waive his right to be represented by Counsel, and that the failure and neglect on the part of the Court to advise the petitioner of his right to representation by Counsel in said legal proceedings was in violation of Minnesota Constitution, Article 1, Section 6, and statutes in this State * * * and was a denial of due process in violation of Article 1, Section 7 of the Constitution of Minnesota and the 14th Amendment to the Constitution of the United States. That by reason of said violation, the trial Court lost its jurisdiction in said matter and that the judgment of said Court herein is null and void."

■ The principal issue for determination here is whether the respondent was denied his constitutional right to counsel. To establish that there was an intelligent waiver of such right, it must appear that the accused had knowledge of the nature of the crime with which he is charged, the penalties involved in connection therewith, and his right to counsel to aid in his defense against the crime charged. If these requirements have been met, it cannot be said that the accused did not knowingly waive his constitutional rights.

■ In the present proceedings testimony was taken before a referee appointed by this court, and the trial here, of course, is de novo. State ex rel. Thomas v. Rigg, 255 Minn. 227, 96 N. W. (2d) 252. Respondent was questioned under oath with respect to his knowledge of the meaning of the indictment and the penalties involved. The following answers made by him we deem to be of significance in so far as they throw light upon what respondent understood and did not understand at the time of his plea of guilty:

"Q [Mr. Houston, counsel for appellant] Did you understand from the language used in the indictment where it said, 'Frank McCool, alias Frank J. Curtis and John Doe—' The John Doe referring to you. '—whose true name is unknown, is accused by the Grand Jury of the County of Hennepin in the State of Minnesota by this indictment of the crime of murder in the first degree', did you understand that much of it?

"A Well, I understood that it was murder.

"Q And you understood it was murder in the first degree?

"A   Well, I had no knowledge of the distinctions at that time.

"Q   You understood what the words meant, did you?

"A   Well, I understood the words all right.

"Q   And then it says after that, '—commited as follows:' And then it goes on to tell how the crime was committed, and this is the language, 'That the said Frank McCool, alias Frank J. Curtis and John Doe, whose true name is unknown —' Referring to you. '—On the 24th day of April, a. d., 1917, at the City of Minneapolis in Hennepin County, Minnesota, then and there being —', now, you understand it so far, don't you?

"A   Go ahead.

"Q   '—being armed with dangerous and deadly weapons', you understand what that means?

"A   That is true.

"Q   'To wit: Pistols, commonly called revolvers, a more particular description of said weapons being to the Grand Jury unknown', you understand what that means?

"A   Go ahead.

"Q   Do you?

"A   Yes. Well, that is all right.

"Q   'Said revolvers being then and there loaded with gunpowder, and leaden bullets —'. You understand what that means?

"A   Go ahead.

"Q   Do you?

"A   OK.

"Q   Do you understand it?

"A   That is clear so far.

"Q   '—and said revolvers being then and there held in the hands of them, the said Frank McCool, alias Frank J. Curtis, and John Doe—' Meaning you. '—whose true name is to the Grand Jury unknown, did then and there wilfully, unlawfully, wrongfully, knowingly, feloniously and intentionally, without excuse or justification, without authority of law and with a premeditated design to effect the death of a human being, to wit: One George Connery—', you understand what that means?

"A   Well, I did not understand it in that sense at the time. I listened to it.

"Q   In what sense?

286

* * * * *

"Q When you said that you wilfully did it, do you understand what that means?

"A Yes, that is true. I understand what wilfully means.

"Q When it says you unlawfully did these things, do you understand what that means?

"A Yes, I understand that.

"Q When you said you wrongfully did it, do you understand what that means?

"A I understand that.

"Q When it says you knowingly did it, do you understand what that means?

"A I understand it all right, but it did not happen to be the things—

"Q When it says you feloniously did it, do you understand what that means?

"A Yes.

"Q Intentionally, do you understand what that means?

"A I did. The point I was trying to make was—

* * * * *

"Q * * * When it says that you did this act without excuse or justification, do you know what that means?

"A I do.

"Q And when it says that you did it without authority of the law, do you know what that means?

"A I do.

"Q And when it says that you did it with a premeditated design to effect the death of a human being, do you know what that means?

"A I do now.

"Q And you did not then?

"A I did not realize what that was at that time.

"Q Do you know what premeditated means?

"A I doubt that I even knew the meaning of the word premeditated at the time.

"Q Do you know what design means?

"A I do.

"Q You knew then?

"A  Yes, I think I knew what design meant at the time.

"Q  To effect the death of a human being, do you know what that means?

"A  I do.

"Q  And you knew then?

"A  Yes, I knew that.

"Q  And you knew what they meant when they said, 'George Connery'?

"A  Yes.

"Q  And you knew what it meant when it said that you did kill and murder the said George Connery?

"A  I wonder whether I did or not.

"Q  Did you have any doubt what '—kill George Connery', meant?

\*   \*   \*   \*   \*

"\* \* \* No, not kill George Connery, I had no doubts about it.

"Q  \* \* \* You did not have any doubt about what the '—kill and murder George Connery—' meant, did you?

"A  Well, in view of the fact that it was an accident, I suppose I would have had considerable doubts.

"Q  I am talking about what the indictment meant.

"A  OK.

"Q  You knew that the indictment accused you of wilfully killing George Connery with intent to kill him, you understood that, didn't you?

"A  I think I pleaded guilty to that all right, yes.

"Q  You knew what you were pleading guilty to?

"A  I doubt it.

\*   \*   \*   \*   \*

"Q  \* \* \* You understand what the indictment meant when it said that you, '—killed George Connery by then and there discharging said revolvers at, against, upon and into the body and person of him, the said George Connery', didn't you know what the language meant?

"A  Yes, I knew what that meant.

"Q  You knew it was true, didn't you?

"A  I never denied it.

\*   \*   \*   \*   \*

"Q  \* \* \* And you knew that it was true that you had effected the

death of George Connery by discharging a loaded firearm into his body?

"A   Yes.

\*   \*   \*   \*   \*

"Q   And when you entered your plea of guilty, you knew that that carried with it consequences by way of imprisonment, did you not?

"A   I did.

\*   \*   \*   \*   \*

"Q   You came up here to effect the death of Alice Dunn, didn't you?

"A   I did not.

"Q   How long after Connery was killed, was Alice Dunn killed?

"MR. WEISMAN:   If the Court please, that is objected to as absolutely irrelevant, incompetent and immaterial. The Dunn matter has nothing to do with this whatsoever. That is another separate matter, it is not being tested here on this writ.

"THE COURT:   Oh, I do not think there is any necessity to prove that this man did not know the meaning of the word 'murder', he admits that, I think. Is that what the proof is going to?

"MR. HOUSTON:   Well, I think that is perhaps true."

■   Other evidence before this court relates to the testimony of respondent in State v. Dunn, 140 Minn. 308, 168 N. W. 2. In that proceeding, the record there indicates respondent admitted that on April 26, 1917, two days after he had murdered George Connery, he had murdered Mrs. Alice Dunn in St. Paul for a price of $3,000. His testimony there, given on June 21, 1917, in several instances outlined his actions in causing the death of George Connery on April 24, 1917, as follows:

"Q.   And what happened, if anything, on your way to Minneapolis?

"A.   I was arrested again for speeding.

\*   \*   \*   \*   \*

"Q.   And when you were arrested at that time what occurred?

"A.   Policeman Connery got in the car to take us to the station.

\*   \*   \*   \*   \*

"Q.   You murdered Connery by breaking his head in with your pistol, did you not?

\*   \*   \*   \*   \*

"A.   I did not. I murdered him by shooting him.

"Q.   Where?

"A.   In the leg and the bullet later went up through his body, came out in his back some place.

"Q.   How long did he live after you shot him?

"A.   I don't know.

"Q.   How long was he in your company after you shot him before you left him—when you finally left him?

"A.   Perhaps three-quarters of an hour or an hour or such a matter.

\*   \*   \*   \*   \*

"Q.   Had he received any other injuries at that time?

"A.   He had, yes.

"Q.   Where?

"A.   He had been hit over the head.

"Q.   By whom?

"A.   By me.

"Q.   With what?

"A.   My pistol.

"Q.   This pistol?

"A.   This pistol right there.

"Q.   Where were you when you hit him over the head?

"A.   About 8 or 10 miles out of Minneapolis.

"Q.   Where was it you left Connery finally?

"A.   Same place.

\*   \*   \*   \*   \*

"Q.   At the place where his body was found?

"A.   It was.

"Q.   Was that where you hit him?

"A.   That is where I hit him.

"Q.   How many times did you hit him?

"A.   Two or three times, I disremember which.

"Q.   Did you fracture his skull?

"A.   I don't know whether I did or not.

"Q.   Did you knock his brains out with your pistol?

"A.   I didn't see any.

\*   \*   \*   \*   \*

"Q. Did you strike Connery with the butt end, or the barrel of this? (Referring to the revolver in evidence.)

"A. The butt end.

"Q. Show how you did it.

"A. I was holding the pistol like that (witness illustrates by grasping the barrel of the revolver).

\* \* \* \* \*

"Q. How many times did you strike him?

"A. I hit him two or three times."

With reference to the murder of Mrs. Dunn, to which this court refers for the purpose of establishing respondent's knowledge of the nature of his crimes and of the penalties therefor, respondent testified:

"Q. What was the original price that you were to be paid for murdering Mrs. Dunn?

"A. The original price that was to be paid was $3,000."

He also testified as follows:

"Q. Now, what was the purpose and why did you go to the McQuillan house, 793 Selby Ave. on the morning of the 26th of April, 1917?

"A. To kill Mrs. Dunn.

\* \* \* \* \*

"Q. Did you go there for any other purpose?

"A. Yes, I had intended taking her diamonds or any jewelry that was in the house.

"Q. And why?

"A. To cause it to have the appearance of robbery—burglary.

"Q. To have what?

"A. To cause the killing of Mrs. Dunn to have the appearance of a burglary.

"Q. To have the appearance of a burglary?

"A. And being done while the home was being robbed."

And further as follows:

"Q. You shot Mrs. Dunn three times, did you?

"A. I did.

"Q. Did you strike her?

"A. I did not.

"Q. Did you inflict any injury upon Mrs. Dunn except shooting her three times?

"A. I did not."

At the same trial Katherine Irene McQuillan, who was an eyewitness to the murder of her sister, Mrs. Alice Dunn, and who was in bed with the latter at the time she was murdered by respondent, testified as follows:

"* * * I sat up in bed and I called, and I said, 'Who is it,' and I didn't get any answer again, and Alice woke up and she said, 'Kathy dear, you are dreaming again; lie down,' * * * and the next thing I saw was a man going into her old bedroom.

\* \* \* \* \*

"* * * I said, 'Alice, Alice, there is somebody in this house,' and as soon as I said Alice this man jumped right in our room, and I wanted to know who he was and what his business was, and he said, none of my business, 'To be calm, be calm; he was only going to do a little shooting.' And I had Alice in my arms tight, and he came over to the bed and he hit Alice. First he shot the light in our face, a flashlight, and I had Alice tight, and when he was coming in the room I took her diamonds off because I thought he was after her diamonds, and I had them on this hand. (Right.)

\* \* \* \* \*

"* * * And then he flashed the light, and as he did he hit Alice on this side of the head, and I was so tight that it hit me on this side, our two heads bumped.

"Q. You mean the hit that struck her bumped her head against yours?

"A. It bumped my head too.

"Q. Her head bumping yours?

"A. Yes, sir, and then he fired three shots one right after another, just as quick as a flash.

\* \* \* \* \*

"Q. And was your sister in your arms at that time?

"A. She was; I still had hold of her. He pushed me aside before he did any shooting.

\* \* \* \* \*

"A. He did, but I still clung on to her, I had her by my hand.

"Q. Do you know where she was shot?

"A. She was shot in the head, and she was shot down here some-where (indicating breast) there was a big hole; the whole side of her head was gone.

"Q. After he did this shooting what became of him?

"A. He went out."

The deputy coroner of Ramsey County testified with reference to a post mortem examination he had made of Mrs. Dunn. His testimony was to the effect that in addition to the three bullet holes he had found in her head:

"\* \* \* The bones of the head and side and top of the head were crushed in, practically all the bones of the top of the head, the two parietal bones, the side, the frontal bone, the temperal bone and the upper part of the occipital bone were crushed in, and the brains crushed and lacerated and the bones comminuted, that is, in small pieces. \* \* \*

"Q. Can you from your examination and your post-mortem ex-amination, doctor, state in your opinion the cause of death?

"A. The cause of death was the laceration and hemorrhage of the brain and fractured skull and laceration of the lungs with the attendant hemorrhage.

\* \* \* \* \*

"Q. Was there evidence of more than one blow being struck?

"A. No, sir.

"Q. On that wound?

"A. No, sir. That is, I couldn't say. It was just simply a crushing wound. In my opinion, it was one blow.

"Q. One blow?

"A. One heavy blow. I couldn't say positively whether there was one or two, but it was thoroughly crushed.

"Q. From what kind of an instrument?

"A. From some blunt, heavy instrument. I couldn't say."

■ From the foregoing facts we cannot escape the conclusion that respondent, who at the time of trial on May 25, 1917, was guilty of two brutal murders committed within a space of two days, was quite aware of the nature of the charge against him—murder in the first degree—and the penalty therefor. Although his formal education was limited, it fairly appears that he was a man of intelligence, perhaps above the average, who had deliberately set out on a criminal career and who did not hesitate to hire out for murder. His statement that he did not desire any counsel, when viewed in the light of the facts outlined, in our opinion clearly compels the conclusion that respondent intelligently waived his constitutional right to counsel with full knowledge of the consequences of his actions. It would follow that the court was not divested of jurisdiction to receive his plea of guilty and to sentence him to life imprisonment for the crime of murder in the first degree.

The rules applicable in the situation presented here have been repeatedly set forth by this court. Their most recent pronouncement is in State ex rel. Thomas v. Rigg, 255 Minn. 227, 96 N. W. (2d) 252, to which reference is made in support of our conclusions here.

The order appealed from is reversed, the writ vacated, and respondent remanded to the custody of appellant.