## STATE v. FREDERICK A. BRIGGS.[1]

July 25, 1913.

Nos. 17,944—(2).

**Robbery — evidence of conspiracy — self-serving declarations.**

Defendant was convicted of the crime of highway robbery, and appealed from the judgment and also from an order denying a new trial. It is *held:*

(1) The evidence supports the verdict of guilty.

(2) The testimony of an accomplice, upon whose evidence the state chiefly relied for conviction, was sufficiently corroborated by other competent evidence.

(3) The evidence, taken as a whole, disclosed a conspiracy or general scheme between defendant and others for the commission of the crimes of robbery, larceny and burglary; evidence of the commission of such crimes and about the time of the commission of the crime charged was admissible as corroborative of the evidence tending to show the guilt of defendant of the charge on trial.

(4) Certain declarations of defendant in respect to his conduct and pur-

[1] Reported in 142 N. W. 823.

---

Note.—The authorities on the question of evidence of other crimes are reviewed in an elaborate note in 62 L.R.A. 194.

poses, made before the commission of the crime charged, were self serving
and properly excluded by the trial court.

(5) One of the conspirators was an escaped convict, and defendant admitted
that he had stated to several persons that he had harbored the convict after
escape; it is *held* that the ruling of the court excluding his explanation of
the statements so made, which he insisted on the trial were not true, was
without substantial prejudice to the rights of defendant, and not ground for
a new trial.

(6) The record presents no reversible error, and there was no misconduct
on the part of one of the jurors in reading newspaper comments of the
trial, of a character to justify a new trial.

Defendant was indicted for the crime of highway robbery, tried
in the district court for Hennepin county before Hale, J., and a
jury, and convicted. From the order denying defendant's motion
for a new trial and from the judgment of conviction, he appealed.
Affirmed.

*Edward B. Graves,* for appellant.

*Lyndon A. Smith,* Attorney General, and *James Robertson,*
County Attorney, for respondent.

BROWN, C. J.

Defendant was indicted and thereby duly charged with the crime
of highway robbery, alleged to have been committed at the city of
Minneapolis on the night of July 13, 1911. He was found guilty
and sentenced to imprisonment for a term of years, and appealed
from the judgment of conviction and also from an order denying a
new trial.

The case, though presenting by the evidence some unusual features,
is an ordinary charge of highway robbery, in respect to which the
law is well settled. The record before us is very voluminous, cov-
ering three volumes of typewritten matter, and is supplemented by
an elaborate argument by counsel for defendant of something over a
thousand pages. In disposing of the case, we shall not review the
evidence any further than may be necessary to an undertsanding of
the questions involved, for an extended discussion thereof would
serve no useful purpose. The state established the fact, about which
there is no controversy, that, at the time charged in the indictment,

Martin Brennan was "held up" and robbed by one Jerry McCarthy, who, at the point of a revolver, took from him a diamond pin, a watch, and a pocketbook containing a small sum of money. There is no claim that defendant was personally present and actually participated in the commission of the crime. The contention is that he aided, counseled and advised the commission thereof, and that he is therefore guilty as a principal offender under section 4758, R. L. 1905. If the evidence sustains this claim, the position of the state is correct. The important question of fact is whether defendant so aided, counseled and advised the commission of the crime.

A brief reference to some of the persons who played an important part in the events leading up to the crime, some of whom were witnesses on the trial, will be of assistance in understanding the issues presented.

Jerry McCarthy, the actual perpetrator of the crime, was and had been for some time a confirmed criminal, and a daring outlaw. He had been convicted of several crimes, and accused and suspected of the commission of offenses for which he had not been called to account. In March, preceding the crime in question, he escaped from the state prison, where he was serving a sentence under conviction of an assault upon a police officer with intent to kill. The evidence tends to show that, from the time of his escape, he made his headquarters in northeast Minneapolis, in the immediate vicinity of the residence of defendant with whom he was acquainted and on intimate terms, as will be presently noted. During the month of June preceding the crime in question, he committed several crimes in this neighborhood, but was not apprehended therefor.

Joseph Olinger was a police officer, and his "beat" included that portion of Minneapolis where McCarthy operated after his escape from prison. Olinger knew McCarthy, and knew also that he was an escaped convict. Just when he learned that fact is not important. The evidence justifies the conclusion, however, that he knew that McCarthy was operating within his territory. But it may be said, in behalf of the dead officer, that his apparent acquiescence in several crimes committed by McCarthy, and his failure to arrest him,

were probably due to a plan matured in his mind to wait for an opportune moment, when the arrest might be effected without danger of loss of life. He was aware of McCarthy's desperate character, and knew of the danger of attempting his arrest. Some time after the commission of the crime in question, he made an effort to take McCarthy into custody, the result of which was the death of both.

Arthur H. Denson resided in the same neighborhood, and owned a pool room and cigar stand, which was much frequented by McCarthy, Olinger and defendant. Denson also owned an automobile, which he operated for the convenience of, and to enable McCarthy to make hasty escape from, the place of crimes committed by him. His assistance in this respect was frequent, though the evidence does not show that he ever actually participated in the commission of any of the crimes charged against McCarthy. He was either in voluntary conspiracy with McCarthy and defendant, for the purpose of perpetrating the crimes, or he was, as he claimed on the trial, coerced to enter therein to the extent stated by threats at the hands of defendant and McCarthy, who possessed minds of much greater strength than he did. Whether he was a voluntary or enforced participant will be referred to later, and in connection with the contention of defendant that it was entirely voluntary on his part.

Defendant, a man well along in years, with a wife and daughter, resided in this section of Minneapolis, and had been a resident of the city for many years. He had associated with men of prominence in the city, held some subordinate official positions, and was generally supposed to be a man of character, though it does not seem that he pursued any established calling. He had known McCarthy for several years prior to the date in question, and well knew of his criminal record and character. McCarthy roomed near and was a frequent caller at defendant's home. In fact, the evidence tends to show that McCarthy possessed a key to the front door of defendant's residence, with which he could enter the house at any time. Defendant was fully informed of what McCarthy was doing in the neighborhood, from the time of his escape from prison until his death, yet he made no report to the police authorities either of his

presence or of the crimes he knew McCarthy had committed. The evidence tends to show that, immediately on McCarthy's escape from prison, he made his way to the home of defendant, arriving there in the night-time, and that defendant supplied him with clothing and money to enable him to elude detection. This fact appears from a voluntary statement made by defendant to police officials after his arrest on the charge of participation in this robbery, and it is fair to him to say that he denied the same when on the witness stand at this trial. The question whether he so harbored and aided in the concealment of McCarthy's identity was one of fact for the jury. Defendant's drinking habits during the time in question were bad. He appears to have kept a supply of intoxicants constantly on hand at his home, and supplied the same to his friends, and to McCarthy, Denson and Olinger. Defendant introduced McCarthy to Olinger as Mr. Nolan, and later informed the officer that Mc-Carthy was his true name, and that he was the escaped convict. He also made known to Denson the fact that Nolan, as he was publicly known, was none other than the outlaw. He stated to Denson, when the latter was induced to join in the program of robbery, that Mc-Carthy was one of the best "yegg-men" in the country, but he signally failed to communicate the fact to any officer of the law except Olinger.

Another person who seems to have taken some part in the law violations, and who was present at some of the conferences at the home of defendant was known only as "Jim," plain Jim. However, immediately after the death of McCarthy at the hands of Olinger "Jim" disappears, makes a successful exit, and is not thereafter heard of or his whereabouts known.

With this general statement, we come to a consideration of defendant's assignments of error, the first of which is that the evidence fails to support the verdict.

1. Several crimes were committed by McCarthy prior to the robbery of Brennan. He burglarized a drug store owned by Kampf & Warneke; the Sorenson grocery store, stealing therefrom about $120, a part of which he paid to Denson; he planned to burglarize the sub-post-office station in northeast Minneapolis; and plans were about

122 M.—32.

matured to rob the Central State Bank, which were interrupted by McCarthy's death. It was the contention of the state on the trial below, and the position is maintained in this court, that defendant was in collusion with McCarthy in all such crimes, including the robbery of Brennan, and that he advised and abetted their commission, though it is conceded that he did not actually participate in either. To substantiate the state's contention in this respect, Denson was produced as a witness, and it was upon the testimony given by him that the state chiefly relied for conviction. The evidence of this witness, if believed by the jury, was sufficient to justify the conviction of defendant. That the jury gave credence and credit to it is evidenced by the verdict of guilty. We discover no reason for disagreeing with the jury, and our examination of the entire record, which has received careful attention, leads to the conclusion that, taken as a whole, the evidence amply supports the verdict, and the contention of defendant that it is wholly insufficient is not sustained. For the reasons heretofore stated, we do not attempt to demonstrate the correctness of the conclusion stated by a discussion of the evidence. The witnesses were before the learned judge below, and with his approval of the verdict we have no difficulty in concurring in his opinion that the verdict was right and should not be disturbed, unless some error was committed during the trial, affecting prejudicially the substantial rights of the defendant.

2. It is contended that Denson was an accomplice in the commission of the crimes mentioned, including the Brennan robbery, that he was in voluntary conspiracy with McCarthy, and that his testimony, uncorroborated, is insufficient to justify a conviction. If Denson was an accomplice as contended, the position of defendant is well taken. R. L. 1905, § 4744. Soon after the death of McCarthy, Denson was arrested and taken into custody as a party to the Brennan robbery. He then made a full and complete statement of the facts leading up to this and the other crimes referred to, implicating defendant as an accomplice, and an absent participant therein. All this he repeated as a witness for the state on this trial. He claimed to the police, and again in court, that his participation and co-operation with defendant and McCarthy were brought about

and induced by fear and threats at their hands. He related that, at an early date in June, defendant came to his pool room late in the evening, and extended him an invitation to go to defendant's residence and have a bottle of beer. He accepted the invitation. Upon entering defendant's home, he found that McCarthy and "Jim" had preceded him. He claims that soon after some beer had been served defendant stepped into an adjoining room and immediately returned with a sword and dagger, brandished them before the witness, at the same time insisting that he, Denson, must join with defendant and McCarthy in criminal operations. That McCarthy then drew two revolvers, and made the same demand, saying that Denson's automobile was necessary to enable a safe and speedy escape from the scene of crime. Denson claimed that, by this demonstration, he was coerced, from fear of personal harm, into joining with defendant and McCarthy, and that he did so under compulsion and for his own protection. The state insists that this version of Denson's connection with the crime expresses the truth, while defendant insists that his conduct in the matter was entirely voluntary and in the hope of gain.

We do not deem it necessary to determine the truth in this respect. It may be conceded, in harmony with defendant's contention, that Denson's participation was entirely voluntary and that he was an accomplice. We find, however, from the record, ample evidence in corroboration of his testimony implicating defendant in the commission of this and the other crimes. He is corroborated by defendant's own testimony, by the voluntary statement defendant made to the police officials, and by the testimony given on the trial by Officer Cronin. All of which, if satisfactory to the jury, sufficiently corroborated Denson.

It is well settled in cases of this kind that the corroborating evidence need not be sufficient, in itself, to justify conviction of the accused. All the rule requires is that the corroborative evidence tend in some substantial measure to affirm the truth of the testimony of the accomplice and to point to the guilt of the defendant. State v. Lawlor, 28 Minn. 216, 9 N. W. 698; State v. Clements, 82 Minn. 434, 85 N. W. 234; Clark v. Clark, 86 Minn. 249, 90 N. W. 390;

1 Dunnell, Minn. Dig. § 2457. The evidence in this case fully brings it within the rule, and was competent and admissible for the purpose. The case of Sykes v. U. S. 204 Fed. 909, does not apply to the facts here presented.

3. Defendant further contends that the court below erred in his prejudice in admitting evidence of the other crimes committed by McCarthy, as heretofore stated; that such evidence was not admissible either in corroboration of Denson or as tending to prove the guilt of defendant of the crime charged. In this we do not concur.

The evidence was clearly admissible in corroboration, for it tended strongly to confirm the state's contention that a general plan and scheme was inaugurated by defendant and McCarthy, and we think Denson, and probably Olinger, to commit the crimes for the purpose of plunder and gain. The evidence shows, at least tends to show, that, soon after McCarthy escaped from prison, he came into touch with defendant, and a plan and purpose was then formed to profit from his criminal ability and skill. Denson was subsequently brought into the conspiracy, because of his ownership of an automobile, which was serviceable in enabling McCarthy, as expressed in the testimony, to "make his getaway." It was not intended that defendant should personally participate in the commission of the lawless acts. But it was intended that he should, and the evidence shows that he did, co-operate, counsel and advise with McCarthy upon the subject. The case is brought within the rule by which evidence of other crimes is admissible in corroboration of the specific charge laid in the indictment. State v. Ames, 90 Minn. 183, 192, 96 N. W. 330; State v. Peterson, 98 Minn. 210, 108 N. W. 6. All other crimes, of which evidence was received, were committed about the time of the Brennan robbery, and during a period of a month or six weeks, and were intimately associated and connected with the general plan for which the evidence tends to show the conspirators banded themselves together. This statement includes the burglary of the drug store of Kampf & Warneke. There may be some evidence tending to show that defendant did not expressly advise this crime, but it was one of the series contemplated by the parties, and it was for the jury to say whether defendant had previous knowledge there-

of. It may be stated in this connection that the evidence does not directly show that McCarthy ever paid over to defendant any portion of the stolen property, or the proceeds thereof. But the absence of direct evidence on this point is not conclusive that defendant received no part of the same, or that he was not involved in the commission of the crimes.

4. The statement made by defendant to the police officers after the death of McCarthy, and after defendant's arrest, which appears to have been voluntary on his part, seems to have been in response, in many respects, to questions put to him by the officers or the county attorney. In the course of the statement by defendant, which occupied some time, Capt. Quealy, of the police force, interposed with certain questions, and also made certain statements of information pertinent to the subject that had been communicated to him by third persons. All this was received in evidence over defendant's objection. In this we discover no error of a nature to justify a new trial. The statement of facts by defendant, together with the questions put to him and the remarks of the police captain, were taken down by a stenographer, thereafter transcribed in typewritten form, and the whole document, thus prepared, was received in evidence and went to the jury for what it was worth. The only objection to the statement was that it was "incompetent, irrelevant and immaterial, except in so far as it may relate to the Brennan robbery." There was no specific objection to the Quealy remarks contained in the stenographic transcript, and the court was not called upon to rule whether they were admissible as evidence against defendant. If such specific objection had been made, or had the court been requested to exclude those statements, admitting only the statements of defendant, a different question would be presented.

5. Defendant freely admitted associating with McCarthy during the time subsequent to his escape; admitted planning with McCarthy and Olinger the robbery of the bank, heretofore referred to, but he insisted on the trial that his conduct in this respect was solely for the purpose of ultimately causing the arrest of McCarthy, that he, defendant, might thereby obtain the rewards offered for his capture. He claimed that he had no serious intention of permitting the con-

summation of the plans for the bank robbery, and that he became interested therein only for the purpose of gaining time for safely handing McCarthy over to the authorities. He was permitted to fully state to the jury his intentions in this respect, but he contends that the court erred in excluding certain corroborative testimony. He offered to show by certain witnesses that he had stated to them or in their presence that he expected and intended finally to capture the outlaw and claim the rewards; he also offered to testify to things said by him to different persons during the time of his association with McCarthy, indicating that his plans were being laid for his arrest and surrender to the officers of the law.

All this evidence was excluded by the court either as hearsay or as self-serving declarations of defendant, and therefore incompetent and inadmissible. What defendant said on this subject seems not to have been seriously considered by the witnesses who heard it, but rather as loose talk and not as expressing a bona fide purpose on the part of defendant to capture the outlaw. One statement was to the effect that defendant intended soon to "pull off a stunt" that would make certain detectives of wide repute "look like a trey spot." Defendant had a talk with the United States marshal at his office in Minneapolis, in which he stated that he thought he could locate McCarthy, and inquired whether the Federal authorities wanted him. He did not say to the marshal that he was then in daily association with McCarthy, or indicate that the criminal was then in the city of the marshal's residence. This evidence was also excluded, as well as all other testimony of a similar character. We discover no error in the rulings of the court.

The testimony comes within the general rule that self-serving declarations of an accused person are not admissible in his favor, unless a part of the res gestae, or a part of a general confession. 2 Wharton, Crim. Ev. (10th ed.) p. 493, note; 12 Cyc. 426; State v. Spencer, 73 Minn. 101, 102, 75 N. W. 893; Colquit v. State, 107 Tenn. 381, 64 S. W. 713; Newcomb v. State, 37 Miss. 383. And although such declarations are admissible when part of the res gestae, and perhaps in other special instances, the case at bar does not come within the exception. The declarations in question were not a part of the

res gestae, nor in any way connected with the commission of the crime in question, or with the other crimes defendant knew Mc-Carthy had committed in his immediate neighborhood. 2 Wharton, Crim. Ev. (10th ed.) 1225. Defendant admitted that he had stated to several persons that McCarthy had come to his, defendant's, home soon after escaping from prison, and that he had provided him with money and clothing. He testified on the trial, however, that this was not a fact, and he was not permitted to explain why he made such statements. While the court might properly enough have permitted this explanation to go to the jury, it seems clear that defendant was in no way prejudiced by its exclusion. Whatever might have been the explanation, the fact that defendant had put into circulation this false report, namely, that he had assisted McCarthy to escape detection, reflected upon the good faith and honesty of his whole defense, and the explanation could only have further discredited him before the jury. The ruling of the court was without prejudice. The court also properly excluded evidence of a conversation had between defendant and McCarthy. This conversation was self-serving and properly excluded.

6. A number of other assignments of error relative to the admission or exclusion of evidence, and certain remarks of the court during the trial, may be disposed of without extended mention. These assignments present unimportant matters. We have fully considered them with the result that no prejudicial error appears.

7. Another group of assignments challenges certain portions of the charge of the court to the jury and the failure to instruct upon some particular features of the case. These assignments are without merit. The charge, taken as a whole, was a comprehensive statement of the case, and the issues involved, and a clear and accurate explanation of the rules of law applicable to the facts. It was not excepted to at the trial, nor was any suggestion then made that it was incomplete or indefinite in any respect. Defendant made no requests for instructions upon the points now claimed to have been omitted from the charge, and is therefore in no position to urge a failure to instruct. State v. Zempel, 103 Minn. 428, 115 N. W. 275.

8. The further contention that a new trial should have been ordered for the misconduct of a juror in reading certain newspaper comments in reference to the case is disposed of by the case of State v. Williams, 96 Minn. 351, 105 N. W. 265. A similar question was presented in the case cited, far more aggravated in this respect than the one at bar, and it was held that the conduct of the juror was not ground for a new trial. The court below was in better position to determine whether prejudice resulted from the act of the juror, and having ruled thereon adversely to defendant, its conclusion should not be disturbed.

9. This covers all that we deem necessary to say. The record has been fully considered, all defendant's points weighed with care, with the result that in our opinion the conviction of defendant is sustained by the evidence, no reversible errors are presented by the assignments of error, and the conviction must stand.

Judgment and order appealed from affirmed.

BUNN, J., took no part.