## EDNA AND FLORENCE HONKOMP v. PHILIPS MARTIN.[1]

January 23, 1931.

No. 28,238.

*A. R. English,* for appellant.

*Hall & Catlin,* for respondents.

[1]Reported in 234 N. W. 638.

HILTON, J.

In each of these two personal injury actions (tried together) plaintiff had a verdict. Defendant appeals in each from an order denying his alternative motion for judgment notwithstanding the verdict or for a new trial.

Plaintiffs, Edna and Florence Honkomp, are sisters, the former 23 years of age and the latter 18. Edna was a school teacher and Florence a senior in high school.

The actions were brought to recover damages for injuries sustained in an automobile accident alleged to have been caused by the negligence of defendant in failing to have his car under control, and in driving at an excessive rate of speed and driving around a corner on the left-hand side of the traveled portion of a highway. The accident occurred on February 28, 1930, at about 5:15 p. m. Edna's verdict was for $250 and that of Florence $7,500.

In each case defendant moved to dismiss the action at the close of plaintiff's case; and after the verdict, for judgment notwithstanding the same or for an order setting aside the verdict and granting a new trial, all of which being denied, he assigns such refusals as error. In addition he also claims as error the refusal of the court to declare a mistrial; that the verdict is not justified by the evidence and is contrary to law; that the damages are excessive and appear to have been given under the influence of passion or prejudice.

■ Plaintiffs and their sister, Mildred Eggermont, wife of Albert Eggermont, were riding in a Chevrolet six coach owned and driven by Albert. Plaintiffs were in the back seat. Defendant was riding alone in his new Studebaker eight five-passenger sedan. The coach, after traveling northward for one mile on state highway No. 14, turned eastward at the "Heagle corner," an abrupt curve. Defendant was proceeding westward toward the same corner. Both cars were going from 20 to 25 miles an hour. Sleet had fallen during the day, and there was some snow on the ground.

The traveled portion of the highway at the point of collision was 30 feet wide; it dipped to the right (south) where the bank was

higher than the roadway, which ran through a cut about four feet deep. There were trees and brush adjoining the inside of the curve.

As the coach began to round the curve from the south the sedan was approaching from the east. Defendant testified that he saw the other car when it was about 100 feet away and that it was then on its own side of the road. Eggermont testified that he was at all times on his right side; that he saw defendant's car when it was about 50 feet away; that just before the accident it came right for him, striking his car when it was way over on the right side of the road.

Defendant's car struck the coach head-on in the center of its left side, which was crushed to the extent of about one-half of its width. Its left fenders were destroyed and the left rear wheel knocked out of shape. The car was otherwise seriously damaged.

The evidence in the case, including that showing the exact point of collision, the damaged condition of both cars, the wheel tracks made by the sedan, measurements taken, a plat and photographs, made the question of defendant's negligence one of fact for the jury. Its determination that defendant was negligent was amply supported by evidence that manifestly predominated over that for defendant and must stand.

■ The trial of the action was commenced on Friday, June 13, 1930, on which day the jury was impaneled and sworn and considerable evidence taken. On the morning of the following day, before court convened, one of the jurors informed the court privately that during the previous evening she had read the provisions of a certain policy of liability insurance which she had at home. She asked the court if she could use the information she received from reading such policy, in the jury room, in discussing the case during the deliberations of the jury. The presiding judge gave an emphatic answer in the negative.

Before the trial was resumed the court fully advised counsel as to the occurrence. Counsel for defendant then moved the court to declare a mistrial. Counsel for plaintiffs stated that he was willing and satisfied to have a mistrial but would ask for another jury.

A conference was then had in the court's chambers, after which defendant's motion was denied.

During the impaneling of the jury it was made known that an insurance company was interested in the case. The nature of the policy examined by the juror was not disclosed. The juror's misconduct was not occasioned by plaintiffs or by anyone acting in their behalf. It was the juror's own thought and action. A careful examination of the record fails to show that any prejudice to defendant could possibly have resulted from the circumstance referred to. In his charge to the jury the court stated:

"You are instructed that nothing seen, heard, read, or otherwise observed outside of this court room may be considered in reaching your verdict in this case, and your deliberations in the jury room must be based solely upon the evidence presented before you in this case in open court and the law as given you by the court; and any fact present in your minds not gained from the evidence in these cases must be wholly disregarded in arriving at your conclusions."

In order to grant defendant a new trial in these cases for a refusal to declare a mistrial, it would require the violent assumption, unsupported by any evidence, that the juror disregarded the court's injunction and that she and the other jurors disobeyed the instructions given them. It is rather significant of the juror's conscientiousness that she thought it necessary to ask the presiding judge as to her right to consider the policy herself or to communicate its contents to her fellow jurors. This assumption should not be indulged in.

The situation was one calling for the exercise of sound judgment by the trial court. We think it was more than justified in the action taken.

Where there has been actual misconduct and it has been without the knowledge and participation of the successful party, much liberality is allowed in sustaining the verdict notwithstanding such misconduct. If as in this case the trial court can determine with reasonable certainty that such misconduct did not affect the result, the verdicts should not be disturbed. The trial court was in

a better position than we are to determine whether prejudice resulted from the act of the juror and, having ruled thereon adversely to defendant, its conclusions should stand. The acts of the juror were insignificant and inconsequential. They did not affect the result, and defendant was in no way prejudiced. State v. Briggs, 122 Minn. 493, 142 N. W. 823; Thoreson v. Quinn, 126 Minn. 48, 147 N. W. 716; State v. Snow, 130 Minn. 206, 153 N. W. 526; Brown v. D. S. S. & A. Ry. Co. 147 Minn. 167, 179 N. W. 1003; 5 Dunnell, Minn. Dig. (2 ed.) § 7105.

■ We now come to the question whether the verdict in the Florence case is excessive or appears to have been rendered under the influence of passion or prejudice. It is frankly conceded in the defendant's brief that the verdict for Edna is probably not subject to criticism as excessive.

The force of the collision rendered Florence unconscious. When she regained consciousness she was in terrible pain and could not walk. She was in the Marshall hospital for ten weeks and two days. For eight weeks she was in a sling made of canvas extending from just below her armpits to halfway between her knees and hip bones, during which time she continued to suffer intense pain. From the time she left the hospital until the time of the trial she was unable to walk except with the aid of crutches. The physician who examined and treated her on the evening of the accident, and also continuously thereafter, found her suffering from severe shock. In addition to certain minor injuries, she had a "comminuted" or "multiple fracture" of the bones of the front part of the pelvis, the pubic bones. It was fractured in five different places, and there was a great deal of displacement in the vaginal area where the bones were broken.

The physicians also testified that the deformity was permanent and could not be changed. The opinion was also expressed that she would always suffer from pain when on her feet or moving about. Expert testimony disclosed that she would be prevented from having a normal delivery of a child; that the injuries resulted in a tilt of the pelvis to the extent of 15 to 20 degrees from normal. This

will cause a strain or pulling across the back or sacroiliac joint, a condition which would become more pronounced later on.

There was expert testimony in favor of defendant, one of his witnesses stating that the injuries would "probably not" be permanent. Another however admitted that the fracture or deformity caused by the injury was permanent.

The reasonable value of the medical services and hospital care incurred by Florence was between $1,100 and $1,200. We have no hesitancy in concluding that the verdict is not excessive and was properly rendered.

Affirmed.