In the Matter of the WELFARE OF D.M.K.

No. C4–83–1277.

Court of Appeals of Minnesota.

Feb. 1, 1984.

---

John R. Koch, Reichert, Wenner, Koch & Provinrino, P.A., St. Cloud, for appellant.

Roger Van Heel, Stearns County Atty., John D. Ellenbecker, Asst. County Atty., St. Cloud, for respondent.

Heard, considered and decided by POPO-VICH, C.J., and WOZNIAK and LANS-ING, JJ.

## OPINION

LANSING, Judge.

This is an appeal from an order adjudicating juvenile D.M.K. delinquent for violating Minn.Stat. § 609.52, subd. 2(1) (1982) (felony theft). The principal issue raised on appeal is whether there was sufficient corroboration of certain accomplice testimony to support a finding that D.M.K. committed felony theft. D.M.K. also contends that certain testimony relating to a bank withdrawal was improperly admitted by the trial court. We affirm.

## FACTS

On June 13, 1983, the St. Cloud Police Department filed a delinquency petition alleging that D.M.K. stole a Honda "three-wheeler" motor-bike. D.M.K., then age 15, denied the charge. A trial was held on August 8, 1983. The bulk of the testimony (and the primary evidence against D.M.K.) came from two other juveniles, J.S. and T.K. J.S., who was 13 years old at the time of the incident, had earlier appeared in court and admitted a delinquency petition alleging a felony theft arising out of the same incident. T.K., also 13 at the time of the incident, admitted a petition alleging that he violated Minn.Stat. § 609.53, subd. 1 (1982) (receiving stolen property). Because this case turns on the sufficiency of non-accomplice evidence, it is necessary to discuss the testimony of each witness individually.

At trial, J.S. testified that he had seen the three-wheeler while delivering newspapers and had decided to steal it. Initially, J.S. talked to T.K. about stealing the bike and T.K. indicated that he wanted to be involved and that he wanted one-half ownership of the bike. Later, J.S. decided to approach D.M.K. to ask him to steal the bike for himself (J.S.) alone. J.S. telephoned D.M.K. and, accompanied by T.K., went to D.M.K.'s home to discuss the proposed theft. At that meeting, J.S. agreed to pay D.M.K. $200 for stealing the bike. J.S. also talked to T.K. and T.K. agreed that the bike could be stored in his family's garage after the theft.

On the evening of February 5, 1983, J.S. and T.K. met D.M.K. and the three of them walked past the apartment building where the bike was kept and looked around. They then returned to J.S.'s house. Later they started back to the apartment building. As they passed T.K.'s house, his father called him in to eat. T.K. went into his house and J.S. and D.M.K. walked on to the apartment building. D.M.K. stole the bike while J.S. waited outside. J.S. and D.M.K. took the bike to T.K.'s house after the theft and, with his help, hid the bike under a table in the garage.

J.S. paid T.K.'s father thirty dollars of his paper route money to store the bike. He spent another twenty dollars on pizza and games for T.K. and some other friends.

D.M.K. demanded that his money be paid to him by 9:00 on the morning of February 19. J.S. went to D.M.K.'s house to pay him the money but was told that he was asleep. D.M.K. telephoned him shortly after he returned home and arranged to meet him. J.S. met him later that morning and paid him the $200.

T.K.'s testimony varied slightly from J.S.'s. T.K. testified that J.S. originally asked him to steal the three-wheeler for $200, but T.K. said he wouldn't steal it because it was too risky. He accompanied J.S. to D.M.K.'s house to discuss the theft and heard D.M.K. agree to steal the bike for $200. After agreeing to store the bike in his family's garage, T.K. went with J.S. and D.M.K. to look over the apartment building. He further testified that he initially went with them when they went to steal the bike but decided it was too risky and turned back. After the theft, he helped J.S. and D.M.K. hide the bike in the garage.

Three other witnesses testified. The first, John Smuda, testified that he was the owner of the three-wheeler, that it had a value of $1,200 and that he had not given permission to anyone to take the bike. He was unable to give any details relating to the theft or the thieves.

The next witness was the father of J.S. He testified that he observed J.S. riding a three-wheeler on February 19, 1983. He inquired where J.S. had obtained the bike and was told it had been purchased from T.K.'s uncle. After further inquiry, J.S. successively indicated that he had found it in the Little Woods, that he had bought it from a kid on the north side, that he had bought it from D.M.K., and finally, that he had hired D.M.K. to steal it. J.S.'s father

also testified that on Saturday morning, February 19, J.S. withdrew $200 from a savings account that he held jointly with J.S. He was then asked, "How do you know that?" He testified that he went to the bank and verified it. The attorney for D.M.K. made a hearsay objection. The court did not rule on the objection and the question was repeated and reanswered without objection. Finally, he testified that after meeting with Officer Nolan, he called D.M.K. and demanded the $200 back. D.M.K. responded, "What $200? You must be kidding. You must be dreaming. I would love to have $200." J.S.'s father then turned the phone over to J.S. and picked up an extension, hearing D.M.K. say to J.S., "What did you do with the three-wheeler?"

The last of these three witnesses, Kathy Nolan, a St. Cloud Police detective, testified that she conducted the investigation and interviewed both J.S. and T.K. but not D.M.K. She testified that while meeting with J.S. and his father on February 19, 1983, she called D.M.K.'s residence and asked D.M.K. about his involvement and was told that he had not seen J.S. since last summer. Officer Nolan ended the conversation. J.S. stated to Officer Nolan that he had been at D.M.K.'s residence that morning to pay D.M.K. the $200. Officer Nolan called D.M.K.'s residence again. D.M.K. was not at home and she spoke with his father. D.M.K.'s father stated that J.S. had been at their residence that morning. D.M.K.'s father had answered the door, and told J.S. that D.M.K. was still sleeping.

## ANALYSIS

D.M.K.'s attorney requested a dismissal at the end of the State's case on the basis that the State had not satisfied the requirements of Minn.Stat. § 634.04 (1982). The court denied the motion and after the defense rested, found the allegations of felony theft to be proved. The court relied on the following bases as corroboration evidence:

1. the testimony of J.S. and T.K.;
2. the statement of D.M.K. to Officer Nolan that he had not seen J.S. since the previous summer;
3. the testimony of J.S.'s father that $200 had been withdrawn from J.S.'s account; and
4. the statement of D.M.K. to J.S. overheard by J.S.'s father: "What did you do with the three-wheeler?"

Minn.Stat. § 634.04 provides:

A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

D.M.K. contends that J.S. and T.K. are both accomplices and their testimony cannot provide sufficient corroboration to support the trial court's finding. The State concedes that J.S. was an accomplice, but denies that T.K. was an accomplice in the theft of the bike and maintains that T.K.'s testimony is sufficient to corroborate the accomplice testimony of J.S.

It is clear that Minn.Stat. § 634.-04 applies to juvenile cases. *In the Matter of the Welfare of K.A.Z.*, 266 N.W.2d 167 (Minn.1978); *In re Welfare of Larson*, 254 N.W.2d 388 (Minn.1977). It is also clear that the testimony of one accomplice cannot corroborate that of another. *K.A.Z.*, 266 N.W.2d 167; *State v. Armstrong*, 257 Minn. 295, 101 N.W.2d 398 (1960). The central issue of this case, whether T.K. is an accomplice, is less easily resolved.

The general test for determining whether a witness is an accomplice for purposes of Minn.Stat. § 634.04 is whether he could have been indicted and convicted for the same crime as the accused. *State v. Jensen*, 289 Minn. 444, 184 N.W.2d 813 (1971). In citing *Jensen*, the court in *State v. Swyningan*, 304 Minn. 552, 555–56, 229 N.W.2d 29, 32 (1975), stated:

A corollary is that where the acts of several participants are declared by statute to constitute separate and distinct crimes, the participants guilty of one crime are not accomplices of those who are guilty of a separate and distinct crime. *State v. Tennyson*, 212 Minn. 158, 2 N.W.2d 833 (1942). Thus, a person who feloniously receives stolen goods is not an accomplice of the thief, *State v. Rosenberg*, 155 Minn. 37, 192 N.W. 194 (1923); and an accessory after the fact is not an accomplice of the principal, *State v. Matousek*, 287 Minn. 344, 178 N.W.2d 604 (1970); *State v. Jensen*, *supra*.

D.M.K. argues that even though T.K. was not present during the actual theft of the bike, he could have been charged under Minn.Stat. § 609.05, subd. 1 (1982). This statute provides that a person is criminally liable for a crime committed by another if he "intentionally aids, advises, hires, counsels or conspires with or otherwise procures the other to commit the crime."

■ In *State v. Ulvinen*, 313 N.W.2d 425 (Minn.1981), the court discussed the level of active conduct needed to satisfy Minn.Stat. § 609.05, subd. 1. Presence, companionship and conduct before and after the offense are circumstances from which a person's participation may be inferred. To determine whether T.K. is an accomplice, T.K.'s and J.S.'s testimony must be examined. The record shows that T.K. was the person J.S. first approached with the idea of stealing the bike. T.K. testified that he refused to steal the bike because it was too risky. The testimony of J.S. and T.K. is inconsistent on the refusal. However, even if we accepted the more inculpatory evidence of J.S. (that T.K. wanted to be involved in the theft when approached with the idea), there is no evidence that T.K. was a principal in engaging D.M.K. to steal the bike. J.S. testified that when he approached D.M.K. to ask him to steal the bike, he was asking only on his own (J.S.'s) behalf. Although T.K. was

present when J.S. asked D.M.K. to steal the bike, there was no evidence that T.K. took any active role in this discussion; the record merely shows that he was present when the discussion took place.

T.K.'s next involvement was his presence with J.S. and D.M.K. when D.M.K. took J.S. to the apartment building where the bike was located. Again, there is no evidence of participation beyond his passive role. The three then went to the home of J.S. where little, if any, discussion took place. T.K. then went home, either because of his father's calling him to dinner or on his own decision, while J.S. and D.M.K. returned to the apartment and stole the bike. J.S. and D.M.K. then took the bike to T.K.'s home and, with T.K.'s help, hid it in the garage.

These actions are similar to the actions of the defendant in *Ulvinen, supra*. Ulvinen told her son that it would be best if he killed his wife, but did not offer advice on when or where to do it. Ulvinen was asleep at the time her son choked his wife. She took no active part in the dismembering of the body but cooperated with her son by agreeing to intercept the children. She also cleaned items from the bathroom that were used in the crime and corroborated his story to prevent anyone from finding out about the murder. The court said:

> Nonetheless, these subsequent actions do not succeed in transforming her behavior prior to the crime to active instigation and encouragement. Minn.Stat. § 609.-05, subd. 1 (1980) implies a high level of activity on the part of an aider and abettor in the form of conduct that encourages another to act. Use of terms such as "aids," "advises," and "conspires" requires something more of a person than mere inaction to impose liability as a principal.

*Id.* at 428.

T.K.'s conduct is not sufficient to elevate him to the level of an accomplice. He was not present when the crime was committed, he did not actively instigate or encourage

the crime, he did not contribute to the payment of the $200 to D.M.K., and he did not share in the fruits of the crime. He was properly charged with receiving stolen property. The evidence is insufficient to show that T.K. could have been convicted of felonious theft.

 Even if T.K. had been determined to be an accomplice, there is sufficient testimony from the remaining witnesses to establish corroboration for the testimony of J.S., independent of T.K.'s testimony. This evidence revolves around the payment of the $200 and the telephone conversation between D.M.K. and J.S. overheard by J.S.'s father. In considering the evidence surrounding the $200 payment, it is necessary initially to consider the admissibility of the evidence relating to the verification of the withdrawal from the savings account. This testimony appears in the transcript as follows: [1]

## REDIRECT EXAMINATION

*By Mr. Deter:*

Q Mr. S., there has been a lot of talk about this $200.00. Where would J. get $200.00? Would he have $200.00?

A Yes, when J. was a little boy, we started a savings account and at the time I never realized it—I put my name on it and he had his name on it, and I didn't think he could take it out of the bank, you know, and evidently he went down and he withdraw (sic) the money out of the bank. He withdrew $200.00 out of the bank that Saturday morning.

Q How do you know that?

A I went down and verified that.

MR. KOCH: I'm going to object to this, Your Honor, as hearsay.

Q (By Mr. Deter, continued) So you went down and verified $200.00 had been taken out of the account?

A Right, and I had his savings account changed as a minor. Then he can't

take it out. But I didn't know it at the time; otherwise, this wouldn't have happened.

MR. DETER: I have no other questions.

MR. KOCH: I have nothing further.

THE COURT: Thank you, Mr. S. You may stand down. Now you can stay in here, if you want to.

(Witness excused.)

The hearsay objection was apparently made to the answer, "I went down and verified that." The objection was not accompanied by a motion to strike and when the question was repeated, the defense attorney neither reasserted his objection nor requested a ruling on the earlier objection. The judge may have concluded that the objection was waived. Without further inquiry into the method for verification of the withdrawal, the hearsay basis for the objection is not established. Even if a hearsay basis were presumed, the retention of the disputed evidence in the record is not determinative of the corroboration issue. It is the testimony by J.S.'s father that J.S. withdrew $200 from the bank on Saturday morning that provides corroboration for J.S.'s accomplice testimony. Any consideration that the trial judge gave the disputed evidence would be harmless error.

J.S.'s testimony about the payment of the $200 is further corroborated by the statement of D.M.K.'s father that J.S. had been at their home on that Saturday morning.

The final piece of external corroboration for J.S.'s testimony was his father's statement that he confronted D.M.K. over the telephone about the return of the $200. The evidence is undisputed that to this point no one had mentioned anything about the bike to D.M.K. Yet when J.S.'s father handed the telephone to J.S. and listened on the extension, he heard D.M.K. ask J.S. what he had done with the three-wheeler.

[1]. Initials are substituted for the actual names that appeared in the transcript.

This statement is a clear indication that D.M.K. had knowledge of the theft. It is even more inculpatory in light of D.M.K.'s statement to Officer Nolan that he had not seen J.S. since the summer before.

*State v. Mathiasen*, 267 Minn. 393, 127 N.W.2d 534 (1964), sets forth the requirements of corroboration needed to support a conviction based on accomplice testimony. Included are:

> (b) The corroborating testimony must link defendant to the crime alleged. The requirement is not satisfied by evidence which proves only that the crime was committed by someone.

> (c) The connection between the defendant and the crime must be established by corroborating evidence which affirms the truth of the accomplice's testimony and points to the guilt of the defendant in some substantial degree; however, it is not required that the corroborating evidence be adequate to establish a prima facie case.

267 Minn. at 397–98, 127 N.W.2d at 538 (footnotes omitted).

The court applied this standard in *In the Matter of the Welfare of K.A.Z.*, 266 N.W.2d 167 (Minn.1978). Two accomplices identified K.A.Z. as helping them set fire to toilet paper in school restrooms. The court found corroboration in the fact that K.A.Z. was one of only four students truant from class when the fires were set. The court held that the corroboration must restore confidence in the naturally suspect testimony of an accomplice. In *K.A.Z.*, as in this case, the corroboration evidence is not strong evidence of guilt, but substantially points to defendant's guilt and sufficiently tends to confirm the truth of the accomplice testimony.

## DECISION

The determination of the trial court judge that there was sufficient corroboration of the accomplice testimony to support a finding that D.M.K. committed felony theft is affirmed. The trial court properly determined that T.K.'s testimony corroborated the accomplice testimony of J.S. T.K.'s testimony alone is sufficient to fulfill the statutory requirement for other evidence that tends to convict the defendant of the commission of the theft; the accomplice testimony of J.S. is also independently verified by the testimony of T.K.'s father and Officer Nolan.

Affirmed.