## STATE v. JAMES A. MATHIASEN.

127 N. W. (2d) 534.

March 6, 1964—No. 39,085.

*Willard P. Lorette,* for appellant.

*Walter F. Mondale,* Attorney General, and *Charles E. Houston,* Solicitor General, for respondent.

SHERAN, JUSTICE.

The appeal is from a judgment of conviction of a felony. Defendant was charged with first-degree robbery in violation of Minn. St. 619.42(2), it being alleged that he did "feloniously rob, take, steal, and carry away from the person and possession of one William Duncan, Two Hundred and no/100 ($200.00) Dollars."

Duncan, called as a witness by the state, was born in 1896 and lives between Howard Lake and Cokato, Minnesota. He had $200 (ten twenties) in his billfold when, on Friday, May 25, 1962, he drove to the A and D Bar in St. Cloud. Arriving there about noon, he became acquainted with Arthur Dimler and James Mathiasen, the defendant. Then, he said, he and Mathiasen went to a nearby liquor store and got a pint of whisky, which they drank at the tavern. Later an additional half pint of liquor was purchased and consumed. He testified:.

"* * * After a while the boys said to me, 'Bill, will you buy a drink' and I reached for my hip pocket and my wallet was gone, and that is what started the row over this deal.

* \* \* \* \* \*

"* * * I didn't see who had taken it, but Dimler and Mathiasen they crowded up around me and one, Dimler, or Mathiasen, he punched me up a little bit, and I think Dimler is the one who got my wallet."

He claimed that it was during this scuffle, occurring in the tavern at about 3 p. m., that his wallet was stolen.

Although he said that "it was between Mathiasen or Dimler" that

his wallet was taken, he did not have any specific fact upon which to base his charge against Mathiasen except that "[h]e was the only man back of me when Dimler grabbed me around the neck." He expressed his difficulty in observing Mathiasen this way: "How can I see back of me, how can you see back of you if some man held your neck and pull up on you, how can you turn around and see who took your wallet." But he noticed his wallet was gone "after this scuffle."

"I probably called them names and wanted to do a little fighting with them.

\*     \*     \*     \*     \*

"We scuffled in there a while, and *then we went outside; I was going to go home, and they followed me out there and gave me a little cuffing up out by the car*." (Italics supplied.)

Margaret Hawla, employed at a place of business near the A and D Bar, looked out at this time and observed that "Mathiasen was scuffling with Mr. Duncan, and Dimler was standing there."

According to Duncan, the fracas lasted "probably ten minutes, five minutes, something like that, and they went back over to the A and D Bar and I went back with them." Then "they called the cops right away."

Roman Koetter of the St. Cloud Police Department received a police radio call at about 3 p. m. on May 25, 1962, in response to which he went to the A and D Bar where he saw Duncan, Dimler, and Mathiasen. Duncan charged that his billfold had been stolen. Dimler and Mathiasen "seemed a little perturbed that they were being accused of taking it by Mr. Duncan," but Duncan "insisted it had been stolen."

Harold Olson, also of the St. Cloud Police Department, arrived at the A and D Bar at about the same time and noted the presence of Duncan, Dimler, Mathiasen, and the bartender, Fritz Thole. Efforts on the part of the policemen to locate the billfold which Duncan claimed had been stolen were unavailing. Duncan was arrested and taken to the city jail where he was booked on a drunk charge. The police officers then "went back to check around the area some more." Mathiasen and Dimler had gone by this time. On the following Mon-

day, Officer Olson, with the assistance of Dimler, located the billfold at a point where it had been discarded.

Arthur Dimler, admittedly an accomplice, said that he and Mathiasen met about 11 a. m. on May 25 at the home of a mutual friend and, after going to the A and D Bar together, became acquainted with Duncan as they drank his whisky. "At one time," according to Dimler, "Mr. Duncan bet me a round of drinks for the house I could not knock his hat off; that was the only scuffle inside the place prior to the complaint." This, said Dimler, "was the only disturbance up to the point where he claimed someone stole his wallet." In that connection Dimler related:

"A. We were drinking and he [Duncan] decided he was going to leave and drive his car, and both me and Mr. Mathiasen told him he was in no condition to drive, and he still wanted to go out to the car, and one of us got on either side to assist him out to the car, and when we got out there that is when he complained he lost his billfold.

"Q. Is that the first time you heard any complaint about the loss of the billfold?

"A. Yes.

"Q. After you got out to the car?

"A. Yes.

\* \* \* \* \*

"Q. What happened out there at the car, tell us in your own words?

"A. Mr. Mathiasen and him went around to the left hand side of the car, that is to the driver's side, and I was on the other side, and pretty soon they come back and he was making the accusation to Mr. Mathiasen he had the billfold, and then Jim pulled out his [own] billfold and he said is this it, and he said it wasn't, and then there was a slight altercation taking place there, I walked in between and at that time I received the billfold from Mr. Mathiasen."

Dimler went back into the A and D Bar, wallet in hand, and "ditched the billfold in the small ventilator" in the men's room; reentering the bar he called the police because "I figured it would look a little better if I called myself."

After the police came and took Duncan to jail, Dimler and Mathiasen "stayed for a few minutes and had a couple of drinks before I went back to the men's room and removed the billfold." Dimler put the wallet in Mathiasen's car "in the seat between the two of us." There was some money in it; he didn't know how much. Dimler said that Mathiasen removed the money, gave him "two 20's and a ten," and that he "blew it in." Later Dimler confessed to the police and accompanied them to the place where he said the wallet had been discarded. It was there.

Dimler acknowledged upon cross-examination that he had been previously convicted of several felonies including two convictions for assault and two for grand larceny in the first degree.

Defendant was found guilty by the jury of the crime of robbery in the third degree and was sentenced to "be committed to and confined in the State Prison at Stillwater, Minnesota, until released therefrom by operation of law or act of the proper authorities."

The question presented upon this review of the evidence is whether the testimony of the admitted accomplice, Dimler, has been "corroborated by such other evidence as tends to convict the defendant of the commission of the offense." Minn. St. 634.04.

■ The general principles to be deduced from the Minnesota decisions[1] and other authorities[2] useful in resolving the problem are these:

(a) In Minnesota, as in most jurisdictions, a conviction cannot rest on the uncorroborated testimony of an accomplice.[3]

(b) The corroborating testimony must link defendant to the crime

---

[1] The Minnesota decisions are collected in Minn. Dig. Criminal Law, Key Nos. 509 to 512.

[2] For a general discussion of the problem, see 23 C. J. S., Criminal Law, §§ 786 to 815; 1 Underhill, Criminal Evidence (5 ed.) §§ 175 to 185.

[3] Minn. St. 634.04 provides: "A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, * * *."

alleged. The requirement is not satisfied by evidence which proves only that the crime was committed by someone.[4]

(c)  The connection between the defendant and the crime must be established by corroborating evidence which affirms the truth of the accomplice's testimony and points to the guilt of the defendant in some substantial degree;[5] however, it is not required that the corroborating evidence be adequate to establish a prima facie case.[6]

(d)  Sources of the corroborating testimony may include scientific analysis of physical objects connected with the alleged crime;[7] reported admissions by the accused;[8] suspicious and unexplained conduct of the accused either before or after[9] the offense. If the accused testifies, inadequacies in his testimony may be corroborative[10] of the assertions of the accomplice, but the failure to testify does not, in itself, provide the required evidentiary support.[11]

(e)  Relevant facts provable by evidence secured from such sources include participation in the preparation for the criminal act;[12] opportunity and motive;[13] proximity of the defendant to the place

---

[4]§ 634.04 concludes: "* * * [T]he corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

[5]State v. Hopfe, 249 Minn. 464, 82 N. W. (2d) 681; State v. Rasmussen, 241 Minn. 310, 63 N. W. (2d) 1. See, also, State v. Sandefur, 249 Minn. 416, 82 N. W. (2d) 623; State v. Star, 248 Minn. 571, 81 N. W. (2d) 94.

[6]State v. Rasmussen, *supra*; State v. Lawlor, 28 Minn. 216, 9 N. W. 698.

[7]See, State v. Hopfe, *supra*.

[8]See, State v. Oelschlegel, 173 Minn. 598, 218 N. W. 117; State v. Huebsch, 146 Minn. 34, 177 N. W. 779.

[9]See, State v. Dunn, 140 Minn. 308, 168 N. W. 2; State v. Star, 248 Minn. 571, 81 N. W. (2d) 94; State v. Briggs, 122 Minn. 493, 142 N. W. 823.

[10]See, State v. Rasmussen, 241 Minn. 310, 63 N. W. (2d) 1; State v. Briggs, *supra*.

[11]See, People v. Goldstein, 136 Cal. App. (2d) 778, 289 P. (2d) 581.

[12]See, State v. Padares, 187 Minn. 622, 246 N. W. 369; State v. Demopoulos, 169 Minn. 205, 210 N. W. 883. But see, State v. Currie, 267 Minn. 294, 126 N. W. (2d) 389.

[13]See, State v. Dunn, *supra*; State v. Demopoulos, *supra*; State v. Korsch, 168 Minn. 354, 210 N. W. 10.

where the crime was committed under unusual circumstances;[14] association with persons involved in the crime in such a way as to suggest joint participation;[15] possession of an instrument or instruments probably used to commit the offense;[16] and unexplained affluence or possession of the fruits of criminal conduct.[17]

(f)   The quantum of corroborative evidence required in any case will depend on the circumstances involved, with consideration given to the claims of both the defendant and the state. The accused is exposed to the danger of imprisonment based on the testimony of a witness naturally inclined to shift or diffuse criminal responsibility. The public interest requires that the guilty be convicted if crime is to be deterred. However, the fact that the development of corroborating evidence requires time and skill and is sometimes difficult to secure does not permit us to accept by way of corroboration less than the statute, as construed by this court, has long required. If the statutory mandate for corroboration of accomplices is to be altered to facilitate convictions, the change should be made by the legislature and not by this court.[18]

▮   In this case the fact that someone took William Duncan's wallet between the time he entered the A and D Bar and the time of his removal from it by the police, approximately 3 hours later, was established by adequate evidence exclusive of that of Dimler. In State v. Ryan, 137 Minn. 78, 162 N. W. 893, the defendant, a stranger in a community with no particular reason for being there, was convicted of grand larceny in the second degree upon circumstantial evidence in-

---

[14]State v. Rasmussen, *supra*; State v. Star, *supra*; State v. Armstrong, 257 Minn. 295, 101 N. W. (2d) 398.

[15]See, State v. Rasmussen, *supra*. Cf. State v. Star, *supra*.

[16]See, State v. Sandefur, 249 Minn. 416, 82 N. W. (2d) 623.

[17]See, State v. Oelschlegel, 173 Minn. 598, 218 N. W. 117; State v. Jackson, 198 Minn. 111, 268 N. W. 924; State v. Morris, 149 Minn. 41, 182 N. W. 721; State v. Christianson, 131 Minn. 276, 154 N. W. 1095.

[18]In the absence of statute a conviction may be had on the evidence of an accomplice without corroboration. See, 1 Underhill, Criminal Evidence (5 ed.) § 182; Lyles v. United States (5 Cir.) 249 F. (2d) 744; Audett v. United States (9 Cir.) 265 F. (2d) 837.

dicating that he was a "pickpocket" and that he tried to conceal his identity; to disassociate himself from companions involved in the larceny; and to evade apprehension. We do not have a comparable situation here. So far as the testimony shows, the presence of defendant in the A and D Bar was not prompted by the fact that Duncan decided to go there. Defendant was well known in the community and made no attempt to conceal his identity. There was no effort to escape apprehension.

Duncan's testimony does not afford sufficient corroboration. It is possible that he was so intoxicated as to make his observations quite unreliable. Overlooking this, his recitation of events was only that he met both Dimler and Mathiasen at the A and D Bar; that the three drank whisky supplied, in part at least, by Duncan; that (no doubt fortified by the liquor he had consumed) he tussled with Dimler when Mathiasen was nearby; that Duncan noticed that his wallet was missing and complained that it had been stolen; that Mathiasen, Dimler, and Duncan were brawling outside the tavern near Duncan's car; that the three then reentered the "beer joint"; that the police on being called heard Duncan's complaints, searched for the billfold without avail, and then conveyed him to the city jail where he was booked as a drunk.

It was not until the next day (Saturday) that Dimler was arrested. He apparently confessed his involvement in the theft and on Monday took the police to the place where Duncan's empty wallet was to be found. Mathiasen was questioned again on that day, which would suggest that Dimler had involved his companion at an early stage of the inquiry. This fact militates against the likelihood that Dimler received assurance of leniency in exchange for an agreement to testify against Mathiasen. It does not, however, provide the required nonaccomplice corroboration.

One other feature of Dimler's testimony deserves comment. He claimed that he had obtained the wallet from Mathiasen when the latter was arguing near the victim's car, and that after the police had taken Duncan to jail Dimler removed the wallet from the place where he had concealed it and drove away with Mathiasen in the latter's automobile. At this point the wallet should have contained somewhere

between $180 and $200. According to Dimler, Mathiasen gave him $50 and kept the balance of the money himself. It was then that the empty wallet was discarded. Dimler claimed that he started to spend his share of the loot the same day and had disposed of about half of it before his apprehension. In view of this recitation it is difficult to understand Duncan's statement that he received $100 from Dimler's attorney by way of partial restitution.

There is no testimony in the case, except Dimler's, to show that Mathiasen was ever in possession of the wallet or any of its contents. Examination for fingerprints was either not made or not reported. There is no nonaccomplice testimony showing that Dimler and Mathiasen did in fact leave the A and D Bar together in Mathiasen's car. There is no corroboration by way of conduct on the part of Mathiasen after the alleged theft pointing to his guilt. If anything was ever said by Mathiasen inconsistent with a claim of innocence, we cannot find it in the record. There is no showing of expenditures by him reflecting participation in the fruits of the theft. While Dimler and Mathiasen were together both before and at the time of the crime, their association is as consistent with a plan to enjoy themselves as with a plan to effect a robbery. Mathiasen's opportunity and motive for taking Duncan's wallet was no greater than that of any other person who happened to be in the A and D Bar while Duncan was there. Duncan's assertion that Mathiasen was involved with Dimler in perpetrating the theft was, at best, confused and conclusional, representing no more than an expression of his suspicions.

There is a great danger that a person in Dimler's situation—having at least four prior felony convictions—would attempt to involve someone like Mathiasen with the thought that by doing so he might, while admitting his own guilt, curry the favor of the prosecuting authorities in order to make it possible to plead guilty to an offense less serious than a felony and thereby escape the serious punishment to which he would otherwise be exposed. See, State v. Sandefur, 249 Minn. 416, 82 N. W. (2d) 623. The likelihood of this occurring is not decreased by the circumstance that Mathiasen, scarred by previous brushes with the law, was probably less than popular in the community.

We recognize that the task of developing corroborating evidence may not be an easy one. We note in the record mention of the names of a number of persons who were present in the A and D Bar while Mathiasen, Dimler, and Duncan were there and were not called as witnesses. The judgment must be reversed; but because it is possible that the required corroborating evidence might be forthcoming upon retrial, the case is remanded to the district court.

Reversed and remanded.