## STATE v. GERALD LEE SORG.

144 N. W. (2d) 783.

August 19, 1966—No. 39,740.

*John S. Connolly* and *Robert C. Bell,* for appellant.

*Robert W. Mattson,* Attorney General, *William B. Randall,* County Attorney, and *Bertrand Poritsky* and *Henry W. Pickett, Jr.,* Assistant County Attorneys, for respondent.

FRANK T. GALLAGHER, C.

This is an appeal from a judgment of conviction for aggravated robbery.

Defendant, Gerald Lee Sorg, was charged with aggravated robbery[1] by amended information in which the court was informed that on December 20, 1963, in Ramsey County, Minnesota, defendant, together with William John Patterson, Gerald Louis Corbo, James Wayne Hughes, and Anthony Valdez, armed with automatic pistols and a German Luger, unlawfully took money in excess of one dollar, owned by Stephen L. and Richard B. Schwietz, from Carmen Delmont, then and there in lawful possession of said property, overcoming his resistance by the threat of the use of force.

At the jury trial it appeared that the robbery took place at Schwietz' Bar in St. Paul. Valdez and Hughes, among others, testified against defendant. Defendant's primary contention on appeal is that as accomplices[2] the testimony of Valdez and Hughes was insufficiently cor-

---

[1] Simple robbery is defined in Minn. St. 609.24 as follows: "Whoever, knowing he is not entitled thereto, takes personal property from the person or in the presence of another and uses or threatens the imminent use of force against any person to overcome his resistance or powers of resistance to, or to compel acquiescence in, the taking or carrying away of the property is guilty of robbery * * *."

Aggravated robbery is defined in Minn. St. 609.245 as follows: "Whoever, while committing a robbery, is armed with a dangerous weapon * * * is guilty of aggravated robbery * * *."

[2] The trial court found as a matter of law that Valdez and Hughes were accomplices. On appeal both parties apparently acquiesce in this finding. Furthermore, there is ample evidence to support it.

roborated.[3] Eleven other witnesses were called by the prosecution, some of whose testimony will be later reviewed. The defense called no witnesses.

Valdez testified that in December 1963 he was living with Hughes in an apartment on East Jenks in St. Paul, and that on December 19, the evening before the Schwietz' Bar robbery, Valdez, together with defendant, Hughes, Patterson, and Corbo, planned the robbery while at the "Jenks" apartment. Later that evening these five men gambled in a house at 1084 Laurel in St. Paul which was occupied by Patterson, Ed Sutherland, Frances McKinnon, and Donna Barstad.

Valdez stated that on the following day the same five men drove to Schwietz' Bar from the "Jenks" apartment. After their arrival at the bar, Corbo remained in the automobile as he suspected that his god-father, a bartender at Schwietz', would be on duty and would recognize him. The other four proceeded into the bar through the rear entrance. Valdez carried a .32 automatic pistol; he wore sunglasses, a hat, and an overcoat; and he held a gloved hand over the lower portion of his face. He testified that Hughes wore a trench coat and a hat and had a "hanky" over his face; that defendant Sorg had a .45 automatic pistol; and that Patterson had a .32 automatic pistol. The customers and the bartender, Carmen Delmont, were "herded" into the poolroom and told to place their billfolds on the pool table, face the wall with their "hands up," and then were made to go into the basement. Thereafter, money was taken from the cash register and from a cupboard and a "folder" behind the bar. Valdez said he took a ring and a watch from a glass behind the bar and that he later hocked the ring and threw away the watch.

As they were going out the back door of the bar, a customer, James W. Mathison, was coming in the same door. Valdez testified that Mathison saw his face—uncovered at the moment—and that he told

---

[3] Minn. St. 634.04 provides: "A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

Mathison to go downstairs into the basement. Mathison later recognized Valdez at a police "lineup."

After the robbery, Valdez, Patterson, Hughes, and defendant rejoined Corbo at the car and proceeded to the "Laurel" house. There, they divided the money they had taken and "squared" their gambling debts from the previous evening.

Valdez declared that a short time later Donna Barstad drove him, Hughes, Patterson, and Corbo to Eau Claire, Wisconsin. From there these four traveled to Chicago and then on to Miami Beach, Florida. Valdez identified a German Luger and two .45 and one .32 automatic pistols as "our" guns. He said he was with Corbo, Hughes, and defendant when one of the .45's—a National Match Colt .45—was "pawned" or "hocked" in a Miami pawn shop. He also identified a .38 pistol which belonged to Hughes and which was traded for another gun in Miami. Valdez was later arrested in Miami Beach where his .32 automatic pistol was picked up in his hotel room by the Miami police.

Valdez also testified to a robbery of the Twin Light Tavern in St. Paul on December 17, 1963, by the same five men. Patterson stayed in the car and the others entered the tavern by the rear entrance. There were two persons in the tavern—the owner, Edward Kelly, and a liquor salesman, Melvin Lang—who were ordered to lie on the floor while the four men proceeded to rifle the cash register and safe; Kelly and Lang were then taken and left in the basement.

The testimony of James Wayne Hughes was basically the same as that of Valdez. Hughes stated that on the night before the Schwietz' Bar robbery, he and the other four were at the "Laurel" house and may have gambled, but they stayed at the "Jenks" apartment for the night. After the robbery the five men split the money equally. Thereafter, Donna Barstad took him (Hughes), Valdez, Corbo, and Patterson to Eau Claire, Wisconsin, where the four men took a bus to Chicago and from there a plane to Miami. A week later they were met in Miami by defendant, together with Frances McKinnon and Donna Barstad. Hughes said that he was present at the disposition of the Luger and the two .45 automatic pistols.

■ If it were possible to ignore the accomplice status of Hughes

and Valdez, we think their testimony would have been sufficient to justify the verdict of guilty under Minn. St. 609.245. However, because they were accomplices, their testimony could not stand alone; corroboration was necessary.

The rules respecting the sufficiency of corroborative evidence have been amply stated in prior decisions of this court.[4] Such corroborative evidence standing alone need not be sufficient to support a conviction. Corroboration is required because the testimony of an accomplice is considered inherently untrustworthy, primarily for the reason that he may testify against defendant in the hope of obtaining clemency for himself. Therefore, corroborative evidence is sufficient when it is weighty enough to restore confidence in the truth of the accomplice's testimony. State v. Guy, 259 Minn. 67, 105 N. W. (2d) 892. See, also, 7 Wigmore, Evidence (3 ed.) § 2059.

Although corroborative evidence need not be of itself adequate to establish a prima facie case of guilt, it must affirm the truth of the accomplice's testimony and point to the guilt of the defendant in some substantial degree. State v. Mathiasen, 267 Minn. 393, 127 N. W. (2d) 534. We stated in that case that sources of such evidence may include, among other things, scientific analysis of physical objects connected with the alleged crime and suspicious and unexplained conduct of the accused either before or after the offense. We also said that relevant facts provable by evidence secured from such sources include participation in the preparation for the criminal act; opportunity and motive; proximity of the defendant to the place where the crime was committed under unusual circumstances; association with persons involved in the crime in such a way as to suggest joint participation; possession of an instrument or instruments probably used to commit the offense; and unexplained affluence or possession of the fruits of criminal conduct.

Reviewing the record in the instant case in the light of the foregoing rules, it is our opinion that there was adequate evidence and corroboration to justify a conviction of the defendant.

---

[4] See, State v. Rasmussen, 241 Minn. 310, 63 N. W. (2d) 1; State v. Armstrong, 257 Minn. 295, 101 N. W. (2d) 398.

Donna Barstad testified that the defendant was at the "Laurel" home with Corbo, Patterson, Hughes, and Valdez on the night before Schwietz' Bar was robbed; that he participated in a poker game with the other four; that on the afternoon of the day of the robbery he returned to the "Laurel" home with the other four and money passed between them in satisfaction of gambling debts. She also testified that she saw hand guns in the possession of the five men during the month of December; that she drove four of them, but not the defendant, to Eau Claire, Wisconsin, shortly after the Schwietz' Bar robbery on December 20, 1963; and that she took a bus trip to Miami shortly after December 25 of that year with Frances McKinnon and defendant.

Lois Benzel, who was with her husband in Schwietz' Bar at the time of the robbery, said that a man with a jacket, knit cap, scarf over his face, and sunglasses ordered her and her husband into the poolroom.

James Mathison said that he was entering Schwietz' Bar from the rear entrance as the four men involved here were leaving by the same door. He said that defendant resembled one of these men; that he had a knit cap and a partially covered face; that, from a distance of 1½ to 2 feet, defendant ordered him into the basement; and that he identified defendant at a "lineup" about a month and a half later by voice characteristics and a partially covered face.

Abraham Trunks, a pawnbroker from Miami, Florida, identified defendant as the person who sold the German Luger to him and testified that defendant used his own name.

■ Defendant argues that the testimony of the two accomplices, Valdez and Hughes, is not corroborated to the extent required by Minn. St. 634.04. He cites State v. Lupino, 268 Minn. 344, 129 N. W. (2d) 294, which he claims affirmed this court's position in State v. Mathiasen, *supra*. The defendant contends that the corroborative evidence here is not substantial or adequate to support his verdict of guilty because his identification at the scene of the crime was insufficient; his participation in the planning of the crime and his proximity to the accomplices just prior to the crime is unproved by corroborating evidence; and the testimony regarding his sharing in the

proceeds of the crime and the facts surrounding it is totally unsatisfactory.

It is true that in Mathiasen we reversed the judgment of conviction and remanded the case because of the absence of adequate corroboration tending to convict the defendant of the commission of the offense. In doing so we said that the judgment must be reversed because it is possible that the required corroborative evidence might be forthcoming upon a retrial. We distinguish that case on the ground that the corroborative evidence was much weaker than in the case at bar. That case involved a situation in which the owner of a billfold containing between $180 and $200, the defendant, and a corroborating witness all participated in a rather heavy drinking party at a local liquor store. Some scuffling resulted among the three, and the billfold was missed by its owner. There was testimony to the effect that the defendant was seen scuffling with the owner of the billfold while the other party was standing nearby. The defendant was convicted of robbery in the third degree and appealed. In our opinion there was no such corroboration there to sustain his conviction as in the instant case. Here defendant was implicated in the crime by a girl friend of the robbery gang; one eyewitness at the robbery in question; and another eyewitness at a similar robbery three days before; also a pawnbroker testified that defendant sold him a gun used in the crime. We cannot agree with defendant's claim that there was not enough evidence against him to sustain his conviction.

■ Testimony concerning the separate crime of December 17, 1963, at the Twin Light Tavern in St. Paul was admitted into evidence for the purpose of showing a common scheme or plan. Defendant made timely objections to all such testimony and contends on appeal that it was error to submit such evidence. In that connection the defendant claims that the trial court erred in overruling his objection to the testimony pertaining to the Twin Light Tavern robbery.

It appears from the record that the trial court considered that this testimony was offered for the purpose of showing a similar plan and design. Kelly, the owner of the tavern, testified that on the morning of December 17, 1963, about 11 o'clock, some men came into the back

door of his tavern and came right up to the bar; and that they all had guns, one of which was stuck in his face. He was ordered to come around the front of the bar and lay on the floor face down with his hands at the back of his head. Kelly said he saw three persons with .45 automatics and another with a smaller automatic; that he could hear them back of the bar; that he was searched for his wallet but they didn't find it; that they got Lang's wallet and some $1,027 from the cash register and cash box. He was unable to recognize any of the persons who robbed his tavern.

Lang, a liquor salesman present during the December 17 holdup, testified generally along the same lines as Kelly. He stated that one of the men jerked the phone off the back wall and then they put them both in the basement. He said that he could not positively identify the parties, although he saw "three for sure" and the fourth one as he was coming from the men's room. He remembered that the first man he saw wore a green or gray colored jacket, had his face covered up to his nose, and carried a gun which looked like a .45 automatic. He testified that one of the men wore a black veil, one had a nylon, and the one by the back door had sunglasses on, and that the other man had a "hanky" over his face. He observed the man at the back of the establishment who had what appeared to be a German Luger. He also stated that the man he saw at the Twin Light Tavern had a "sort of a tan colored handkerchief of some kind" over his face.

Evidence connecting the defendant to other crimes is as a rule not admissible, principally because it tends to justify to the jury a finding of guilt irrespective of present charges. State v. Gress, 250 Minn. 337, 84 N. W. (2d) 616. It is generally understood, however, that there are some exceptions. State v. Wofford, 262 Minn. 112, 114 N. W. (2d) 267. Evidence of a separate crime may be admitted if it is reasonably closely related in scheme, pattern, and time to the act charged and its admission is largely within the discretion of the trial court. State v. DePauw, 246 Minn. 91, 74 N. W. (2d) 297. See, also, State v. Spreigl, 272 Minn. 488, 139 N. W. (2d) 167, where we laid down new rules regarding prior related offenses. In State v. Klotter, 274

Minn. 58, 142 N. W. (2d) 568, we reiterated the above rules and also said that the determination of whether independent criminal acts are so closely related to the crime charged as to be admissible is a matter resting largely within the discretion of the trial court and that this court will not reverse unless there is a clear abuse of discretion.

While we do not feel that the evidence here was very strong or convincing so as to link defendant with the robbery at the Twin Light Tavern, we cannot say that the trial court committed reversible error in admitting this testimony, such as it was, under the facts and circumstances here.

■ We have considered other assignments of error and legal issues raised by the defendant. It is our opinion under the record here that neither the State nor Federal constitutional rights of the defendant were violated in connection with these proceedings, and that, viewing the evidence in its entirety, the interests of justice do not require a new trial in this case.

Affirmed.