STATE of Minnesota, Respondent,

v.

Curtis E. HARRIS, Appellant.

No. C8–86–907.

Supreme Court of Minnesota.

May 1, 1987.

C. Paul Jones, Public Defender, Elizabeth P. Davies, Sp. Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., Michael Richardson, Asst. Co. Atty., Minneapolis, for respondent.

SCOTT, Justice.

Appellant Curtis E. Harris appeals from his March 9, 1986, conviction of first degree murder for violation of Minn.Stat. §. 609.185(3) (1984) (causing death with intent while committing or attempting to commit aggravated robbery), and of second degree murder for violation of Minn.Stat. § 609.19(2) (1986) (causing death without intent while committing or attempting to commit a felony offense). The trial court sentenced him to the mandatory term of life imprisonment for first degree murder, and Harris appealed. We affirm the conviction for first degree murder and vacate the conviction of second degree murder under Minn.Stat. § 609.04 (1986).

Harris' conviction arose out of the October 7, 1985, shooting death of Ramon Rojas. Two men, Phillip Burgess and Lawrence Taylor, pled guilty and testified that Harris was the third man involved in the crime. Harris claims to be innocent.

On October 7, 1985, at approximately 10:00 p.m., Rojas got out of a car in the alley behind his apartment building. He was approached by three black men. While one of the men talked with Rojas, another pulled out a sawed-off shotgun. The men then took Rojas to his apartment. Present in the apartment were Pascual Gomez Medina, Victoria Rodriquez, her two young daughters, and her son, Edward Rodriquez, who was 13 at the time of trial.

One of the black men had a knife in his hand. He was identified by Ms. Rodriquez, Gomez, and Edward as Phillip Burgess. Burgess grabbed Ms. Rodriquez and shouted to everyone, "Be still, freeze." Everyone did not freeze. Gomez ran into the kitchen and the man with the shotgun ran after him. Gomez testified that the gunman hit him with something heavy and he lost consciousness. One of the Rodriquez girls tried to run out the door, but the third man, later identified as Lawrence Taylor, pushed her back into the apartment. Edward, however, remained seated on the sofa.

While Burgess was holding her, Ms. Rodriquez saw him stab Rojas three times. Burgess then threw Ms. Rodriquez into a chair and took Rojas into the kitchen. Edward and Ms. Rodriquez could not see what was happening in the kitchen, but they heard arguing and shouting, including, "Where is it?" and "Where is the stuff?" This was followed by a shotgun blast from the kitchen, and the man with the gun then came into the living room and asked Ms. Rodriquez, "Where is it?" She replied that she did not know and a split second later he returned to the kitchen.

After the gunman returned to the kitchen there was a second shotgun blast. The two men, Burgess and the man with the gun, then ran through the living room and out the door. Ms. Rodriquez waited a few minutes to see if they would return. She then looked into the kitchen, where she saw a hole in the wall and Rojas slumped against a table leg. Rojas was dead as a result of a massive head injury from a shotgun wound. Ms. Rodriquez and the children went next door and waited for the police.

A few hours later, Ms. Rodriquez gave a statement to the police. She gave a description of the man with the knife and subsequently identified Burgess from a photographic lineup. She described the gunman as taller than Burgess, but was unable to identify anyone when shown a photographic lineup that included the de-

fendant, Harris. Ms. Rodriquez did not make an in-court identification.

Gomez described the man with the knife as a black man with a big belly and large, protruding eyes, and he identified Burgess as the man with the knife from a photographic lineup. Gomez described the gunman as taller and thinner than Burgess. He was unable to identify Harris from a photographic lineup and did not make an in-court identification. Edward Rodriquez also described the man with the knife accurately and identified him as Burgess from a photographic lineup. In his statement to the police, Edward said that the gunman "was black and he was the one that had the gun. That's all I can remember about him." Edward was unable to identify Harris from a photographic lineup prior to trial.

Mark Taylor, who is not related to Lawrence Taylor, lived in the building next door to Rojas. On the night of the shooting, he was watching television at home when he heard a gunshot. Fearing vandals, he went outside to check his car. He saw a black man by the back door of Rojas' building. He heard a second shot and then saw three men run out of the building, get into a car, and drive away. Mark Taylor got in his car and followed the other vehicle, which later stopped, letting one man out. Mark Taylor accurately described Burgess to the police and described the other men as about six feet tall and 27–28 years old. He identified Lawrence Taylor from a photographic lineup but was unable to identify Harris from one.

The police took statements from the witnesses and collected evidence at the crime scene. None of the physical evidence linked Harris to the crime either by fingerprint or blood type.

Burgess, who fit the descriptions given by the witnesses, was arrested. Initially, he denied any knowledge of the crime, but after talking with a Minneapolis police officer for whom he was an informant, and Janice Camp, his girlfriend, he was willing to cooperate, but wanted some consideration. Burgess named his accomplices as Lawrence Taylor and Curtis Harris.

Search warrants for both Taylor's and Harris' residences were obtained and executed. A sawed-off shotgun, later identified as the murder weapon, was found in Taylor's home where Burgess had said it would be. Some papers and shoes were seized at Harris' residence, but were never linked to the crime. Taylor was arrested at the time of the search. He later gave a statement admitting his participation in the shooting and naming Burgess and Harris as his accomplices. Harris was also arrested. When questioned, he denied knowing either Taylor or Burgess.

Janice Camp, Burgess' girlfriend, testified that on October 7, 1985, the night of the shooting, Harris came to the home she shared with Burgess. Burgess had used some cocaine and was drinking Scotch when Harris arrived. She testified that Burgess and Harris left together after discussing going to get some cocaine. She further testified that she received a threatening phone call from Harris while he was in jail. Harris admitted making the call but denied that it was threatening.

Both Burgess and Harris testified that Harris came to Burgess' home that night and that Harris had just returned from Chicago. Burgess claimed that they left the house together and went to Taylor's to get a ride to get some cocaine. Taylor also testified that Burgess and Harris came to his house to get a ride to get drugs. Harris, however, claimed that although he and Burgess left the house together, they immediately went their separate ways. He testified that he was dancing at Moby Dick's, a bar in downtown Minneapolis, when the shooting occurred.

Burgess and Taylor both testified that Harris was the man with the gun, and Burgess testified that it was Harris who shot Rojas. Burgess and Taylor testified that they all left Rojas' apartment together, but their testimony differs as to the route taken and where each got out of the automobile. Their testimony also differs from the route Mark Taylor observed the car taking. Harris admits he spent the night of the shooting at Burgess' home and stayed there for approximately one week

after that. Burgess, Taylor, and Harris also all testified that Harris had a beard on October 7, 1985, and that he shaved it sometime after that date.

Edward Rodriquez did not identify Harris when he initially testified, but after testifying Edward told Togo Willis, a victim-witness counselor, that he thought he recognized Harris as the man with the gun. The state then sought to recall Edward to make an in-court identification. Defense counsel moved to suppress this identification as the result of an impermissibly suggestive procedure giving rise to a substantial likelihood of irreparable misidentification. The trial court held a mid-trial suppression hearing on this issue.

Edward testified at the suppression hearing that he heard Willis tell his mother, on the day he initially testified, that he would see one of the men who killed Rojas in court. Willis, however, denied that she told Ms. Rodriquez that, and said that she told Ms. Rodriquez, in response to a question, that only one man was being tried at this particular time. Willis testified that Edward could have been in a position to hear that remark.

The trial court ruled that Edward's in-court identification would be admissible and he was recalled and made the identification. On cross-examination Edward said that he was "kind of sure, pretty sure" of his identification. Both when Edward initially testified and when he identified Harris, Harris was the only black man in the courtroom.

After hearing the evidence the jury retired and deliberated for two and a half days. After a day and a half, one of the jurors submitted a question regarding accomplice testimony to the trial court. The trial court consulted counsel and then repeated the original jury instruction regarding accomplice testimony. One day later, the jury returned guilty verdicts.

The issues presented by this appeal are:

(1) Was the evidence presented at trial sufficient to sustain Harris' convictions?

(2) Was Edward Rodriquez' in-court identification of Harris properly admitted?

(3) Did the trial court err by giving CRIMJIG 3.18 regarding accomplice testimony?

1. Harris claims in this appeal that the evidence presented at trial was insufficient to prove identity and/or intent beyond a reasonable doubt. In reviewing a claim of insufficiency of evidence, we are "required to interpret the evidence in the light most favorable to the verdict and must assume that the jury disbelieved any testimony conflicting with the result reached." *State v. Parker*, 353 N.W.2d 122, 127 (Minn.1984) (citations omitted).

■ With respect to the identification issue, Harris claims that the state did not present sufficient evidence to corroborate Burgess' and Taylor's testimony. Burgess and Taylor were accomplices because they "could be convicted of the same offense with which the defendant has been charged." *State v. Houle*, 257 N.W.2d 320, 324 (Minn.1977) (citation omitted). Because they were accomplices, Minn.Stat. § 634.04 (1986) is applicable. That statute provides:

> A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

Minn.Stat. § 634.04 (1986). Accomplice testimony is "suspect and is likely to have been given in hope of receiving clemency by turning state's evidence." *Houle*, 257 N.W.2d at 324; *State v. McLaughlin*, 250 Minn. 309, 320, 84 N.W.2d 664, 672 (1957). Accomplice testimony, it is clear, may not be corroborated solely by the testimony of another accomplice. *In re Welfare of K.A.Z.*, 266 N.W.2d 167, 169 (Minn.1978); *State v. Scott*, 203 Minn. 56, 60, 279 N.W. 832, 834 (1938).

Evidence to corroborate accomplice testimony "is sufficient when it is weighty enough to restore confidence in the truth of the accomplice's testimony. * * * [I]t must affirm the truth of the accomplice's testimony and point to the guilt of the

defendant in some substantial degree." *State v. Sorg*, 275 Minn. 1, 5, 144 N.W.2d 783, 786 (1966) (citations omitted); *see also State v. Mathiasen*, 267 Minn. 393, 399, 127 N.W.2d 534, 539 (1964) ("The quantum of corroborative evidence required in any case will depend on the circumstances involved * * *."). The corroborative evidence required may include:

scientific analysis of physical objects connected with the alleged crime; reported admissions by the accused; suspicious and unexplained conduct of the accused either before or after the offense. If the accused testifies, inadequacies in his testimony may be corroborative of the assertions of the accomplice, but the failure to testify does not, in itself, provide the required evidentiary support.

*Id.* at 398, 127 N.W.2d at 538 (footnotes omitted).

█ Here, the state points to 15 pieces of evidence and an eyewitness identification that it claims corroborate Burgess' and Taylor's testimony. The first ten, which include: "That three men participated in the crime," and "that two men went into the apartment and one stayed in the hall," show the circumstances of the crime. While this may support the veracity of the accomplices' testimony, it does not corroborate their testimony that Harris was the third man. We have stated that "[e]vidence which relates exclusively to the fact of the commission of the crime and the circumstances thereof, as distinct from defendant's connection therewith, is not sufficient" corroboration. *State v. Scott*, 203 Minn. 56, 59, 279 N.W. 832, 834 (1938).

The state, however, also presented evidence that, if believed, would tie the defendant to the murder. Harris left Burgess' home with Burgess shortly before the murder, and Janice Camp testified that they were going to the victim's home to get drugs. Harris shaved his beard shortly after the murder, and when he was arrested claimed he did not know Taylor and Burgess. While in jail, Harris telephoned Camp and she immediately reported that the call was threatening. Edward Rodri-

quez also identified Harris in court as the man with the gun.

█ Harris argues that because Edward's identification was wholly unreliable it did not sufficiently corroborate the accomplices' testimony. We, however, have stated: "Identification testimony need not be positive and certain; it is enough for a witness to testify that it is his opinion, belief, impression, or judgment that the defendant is the person he saw commit the crime." *State v. Senske*, 291 Minn. 228, 230, 190 N.W.2d 658, 660 (1971) (citation omitted). Harris still claims that "kind of sure" is insufficient to prove identity beyond a reasonable doubt. Corroboration, however, "need not be of itself adequate to establish a prima facie case of guilt." *State v. Sorg*, 275 Minn. 1, 5, 144 N.W.2d 783, 786 (1966); *State v. Mathiasen*, 267 Minn. 393, 398, 127 N.W.2d 534, 538 (1964). It need only "affirm the truth of the accomplice's testimony and point to the guilt of the defendant in some substantial degree." *Sorg*, 275 Minn. at 5, 144 N.W.2d at 786; *Mathiasen*, 267 Minn. at 399, 127 N.W.2d at 538. If the jury believed Edward's testimony that Harris was the man with the gun, and that testimony was properly admitted, his testimony would certainly point to Harris' guilt in a substantial degree.

█ Janice Camp's testimony that Harris and Burgess discussed going to get cocaine, that they left together shortly before the murder, and that Harris threatened her after his arrest also provides circumstantial evidence to corroborate the accomplice testimony. Harris' denial that he knew Burgess and Taylor and his shaving are further circumstantial evidence. "Circumstantial evidence may be sufficient to corroborate the testimony of an accomplice. The entire conduct of the accused may be looked to for corroborating circumstances, and if from those circumstances the connection of the accused with the crime may fairly be inferred, the corroboration is sufficient." *State v. Rasmussen*, 241 Minn. 310, 313, 63 N.W.2d 1, 3 (1954) (footnotes omitted); *see State v. Jones*, 347 N.W.2d 796, 801 (Minn.1984).

In *State v. Comparetto,* 292 Minn. 425, 193 N.W.2d 626 (1971), we found corroborative evidence similar to that presented here to be sufficient. In *Comparetto,* one of the victims "testified that she thought defendant was one of the attackers, although she was never positive of her identification"; the accomplice's wife stated that the defendant helped carry goods stolen from the victim into her apartment; and the defendant himself testified that he was with the accomplice both before and after the crime, but that he was asleep in the car during the crime. *Id.* at 426–27, 193 N.W.2d at 628 (footnote omitted).

"Where evidence of corroboration appears its weight and credibility is for the jury." *Rasmussen,* 241 Minn. at 315, 63 N.W.2d at 4 (footnote omitted); *see Comparetto,* 292 Minn. at 427, 193 N.W.2d at 628. Here, evidence of corroboration was presented and, apparently, the jury believed it. This evidence was sufficient to point to Harris' guilt in a substantial degree and, combined with the accomplices' testimony, was sufficient to prove identity beyond a reasonable doubt.

■ Harris also argues that the corroborating evidence with respect to intent is insufficient. Intent "means that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn.Stat. § 609.02, subd. 9(4) (1986). Intent to cause death "may be inferred from the manner of shooting the victim." *State v. Campbell,* 281 Minn. 1, 13, 161 N.W.2d 47, 55 (1968) (citation omitted); *see State v. Plan,* 316 N.W.2d 727, 728 (Minn.1982). Here, a sawed-off shotgun was fired less than six feet—and probably between three and four feet—from the victim's head, and the resulting wound looked as if "his head [was] gone."

Since we hold that the testimony of the accomplices was corroborated and admissible, the evidence of both identification and intent is sufficient to support the jury's verdict.

2. Harris also claims that the trial court erred in admitting Edward's in-court identification because it was the product of an impermissibly suggestive confrontation which created a substantial likelihood of irreparable misidentification. *See Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 198–200, 93 S.Ct. 375, 381–382, 34 L.Ed.2d 401 (1972); *State v. Webber,* 292 N.W.2d 5, 10–11 (Minn. 1980); *State v. Spann,* 287 N.W.2d 406, 407–08 (Minn.1979).

■ Harris claims that the confrontation was impermissibly suggestive because (1) the prosecutor told Edward before he testified that he had seen the defendant's picture but had not identified him and if he could now identify anyone to ask to speak to him privately; (2) a county victim-witness counselor, Togo Willis, told Ms. Rodriquez that only one of the men involved was being tried at this time, and Edward overheard the remark, although he did not know which man would be tried; (3) Edward testified that she also told him he would "see one of the men that shot your friend," but Willis denies this; and (4) Edward saw the defendant in the courtroom where he was the only black man present and clearly the one on trial.

The test we apply "requires us to determine whether the identification procedures used were so impermissibly suggestive as to create a 'very substantial likelihood of irreparable misidentification' "; it "focuses on the reliability of the identification, and a number of factors are considered (along with the suggestiveness of the identification procedures used) in determining whether there was a 'very substantial likelihood of irreparable misidentification.' " *Spann,* 287 N.W.2d at 407 (footnote omitted).

The trial court considered the suggestiveness of the identification procedures used and concluded that they were not impermissibly suggestive, stating:

The circumstances under which the identification was made by Eddy Rodriquez leads me to be convinced that the particular circumstances of the in-court identification were not impermissibly suggestive. Any in-court identification

is always suggestive under the circumstances, perhaps less so for a 13–year-old who does not have an intimate knowledge of the criminal justice system, and particularly a 13–year-old who testified previously in a courtroom setting where the Defendant was not present, that is, the Grand Jury proceedings in this case.

So all in-court identifications are suggestive, but I think the particular circumstances of this case, that is, where he was not pressured in any respect, in fact, not even expected to make an in-court identification, but instead chose to volunteer he was able to make an identification after he had appeared in court and had seen the Defendant for only the second time, does lead me to believe that his testimony should be admitted and is admissible. As I say, its credibility remains a more severe question, but is not one for this Court to determine but rather one for the jury.

His failure to describe the Defendant on prior occasion when he was given the opportunity does not equate necessarily to an inability to identify him. It's clear that a 13–year-old may well have the experience of inability to articulate a description, yet feel confident that he is able to identify the Defendant from the occasions some five months previous.

Under these circumstances, I will allow the testimony of Eddy Rodriquez to be entered on the issue of identification.

Of course, the jury will be appropriately cautioned in the Court's final instructions about the frailties and the problems with any type of identification, eyewitness identification.

We agree that this was not an impermissibly suggestive confrontation. The prosecutor's comment that Edward had seen defendant's picture but had not identified him was unfortunate, and we do not condone it. But, under the circumstances, it did not make this an impermissibly suggestive procedure. More suggestive was Harris' presence in the courtroom where he was clearly the one on trial. This, however, was not a pretrial identification procedure, and the trial court clearly considered it in determining that the identification was admissible.

Factors to consider with respect to the likelihood of irreparable misidentification include:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). Defense counsel elicited testimony on these factors both at the suppression hearing and on cross-examination when Edward was permitted to testify. The trial court, having concluded that there was no impermissibly suggestive confrontation, thought this evidence went to the credibility and weight of Edward's testimony rather than its admissibility. *See United States v. Wade*, 740 F.2d 625, 628 (8th Cir.1984) (concluding that when a witness standing outside the courtroom was asked if she saw the robber there was no impermissibly suggestive confrontation and "the evaluation of [the witness'] testimony was a jury issue").

A claim of a due process violation "depends on the totality of the circumstances surrounding [the confrontation]." *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). Here, the trial court considered those circumstances, including the reliability of the proposed testimony, and concluded that the identification was admissible. We agree that Edward's in-court identification did not violate Harris' right to due process of law.

■ Even if this identification had not met the due process requirements, the evidence, including the corroborated testimony of two accomplices, was so overwhelming that its admission was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

■ 3. Following closing arguments, the trial court instructed the jury, giving

the following instruction with respect to accomplice testimony:

> You cannot find the Defendant guilty of a crime on the testimony of a person who could be charged with that crime unless that testimony is corroborated by other evidence which tends to convict the Defendant of the crime. You may consider Phillip Burgess and Lawrence Taylor are accomplices because they were both charged with the murder of Ramon Rojas.
>
> The evidence that can corroborate the testimony of an accomplice must do more than merely show that a crime was committed or show the circumstances of the crime, but the corroborating evidence need not convince you by itself that the Defendant committed the crime. It is enough that it tends to show that the Defendant committed a crime and that taken with the testimony of an accomplice you are convinced beyond a reasonable doubt that the Defendant committed the crime.

This is a pattern instruction on accomplice testimony, *see* 10 Minn.Dist.Judges Ass'n, *Minnesota Practice*, CRIMJIG 3.18 (2d ed. 1985), and it tracks the statutory language, "other evidence as tends to convict the defendant of the commission of the offense," Minn.Stat. § 634.04 (1986).

Harris claims that this instruction did not contain "all [necessary] matters of law" so as to apprise the jury of its duty, Minn.R. Crim.P. 26.03, subd. 18(5), because, for a conviction based on accomplice testimony to stand, the evidence corroborating the accomplice testimony must "[point] to the defendant's guilt *in some substantial degree*," *State v. Houle*, 257 N.W.2d 320, 324 (Minn.1977) (emphasis added). Harris' trial counsel, however, did not object to the instruction either when it was originally given or when it was repeated. This court has also noted the difference between tests for sufficiency of evidence to support a conviction and jury instructions, and that other courts have held "that not every sufficiency of the evidence test should be read to the jury." *State v. Turnipseed*, 297 N.W.2d 308, 312 (Minn.1980) (citations omitted).

The pattern instruction on accomplice testimony was sufficient.

·First degree murder conviction affirmed. Second degree murder conviction vacated.